THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SNOWRENE O'BANNER, Defendant-Appellant.

First District (6th Division)   No. 1—89—2419

Opinion filed May 17, 1991.—Rehearing denied July 18, 1991.— Modified opinion filed July 19, 1991.

Sam Adam, of Chicago, for appellant.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth W. Goff, and Gael O'Brien, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LaPORTA delivered the opinion of the court:

Following a jury trial, defendant, Snowrene O'Banner, was convicted of murder. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1.) Defendant brought a motion requesting a new trial based upon trial errors and incompetency of trial counsel. The court denied defendant's post-trial motion and sentenced defendant to a term of 20 years' imprisonment.

On appeal, defendant contends that (1) she was deprived of effective assistance of counsel; (2) she was deprived of a fair trial by the prosecutor's improper cross-examination of defense witnesses and by improper comments in his closing argument; (3) the trial court erred in admitting improper rebuttal evidence; (4) the trial court erred in failing to conduct a recorded instruction conference; and (5) the trial court erred by improperly instructing the jury on manslaughter and self-defense.

The record reflects that defendant was convicted of murder following the shooting death of her husband, James O'Banner. The evidence adduced at the three-day trial established that defendant and the victim had been married for 28 years and had lived together at 6132 South Damen in Chicago, Illinois, for approximately 12 years. The couple also lived with their adult daughter, Darlene O'Banner, and with their adult son, Curtis O'Banner. Defendant's sister, Cloverene Collins, lived at 6148 South Damen, four houses south of the home of defendant and the victim. The victim was approximately 5 feet 8 inches tall, weighed between 205 and 210 pounds, and was described as a strong man.

The victim died on April 12, 1986, as the result of a single gunshot which entered the left side of his back near the kidney area and lodged in the soft tissue underneath the skin on the front of the victim's right side near the abdominal wall. The gunshot had perforated the victim's spleen, stomach, pancreas, and liver and had caused contusions in his lung. No stippling or powder marks were discovered on

the skin surrounding the entrance wound, indicating that the victim was shot from a distance of at least two feet. When found by Chicago fire department paramedics, the victim was in his home at 6132 South Damen sitting on a kitchen chair and going into shock. The paramedics transported the victim to Holy Cross Hospital, where he died shortly after arrival.

Prior to trial, defendant, then represented by attorney James Montgomery, filed answers to the State's discovery requests which indicated that defendant did not shoot the victim. She also brought a motion to suppress post-arrest statements. At the hearing on her motion, defendant testified that she did not remember who told her that her husband was shot and that she had not given a statement or said anything to the police officers who arrived on the scene shortly after the shooting. This evidence was contradicted by the testimony of Cloverene Collins, defendant's sister, who stated at the suppression hearing that when the police came to her home after the shooting, she heard defendant say "I did it. I shot my husband." Chicago police officers McGuire and Tristano, Detective Crescenzo and Assistant State's Attorney Semrow all testified at the suppression hearing that defendant had made voluntary statements in which she admitted shooting her husband. The trial court denied defendant's motion to suppress statements. Defendant thereafter terminated her relationship with James Montgomery and retained new counsel, Daniel Wolff, who represented her at trial.

Prior to trial, defense counsel Wolff made a motion *in limine* seeking to bar any testimony concerning an insurance policy on the life of the victim. Although the prosecutor told the court that life insurance would not be mentioned in opening statement or during the State's case in chief, he indicated that the question of life insurance may become important to the State during the cross-examination of some of the defense witnesses or on rebuttal.

Immediately before the trial commenced, defense counsel advised the court that the defendant would testify and stated that self-defense would not be interposed at trial as the defense for his client's conduct.

At trial, Chicago police officer Daniel McGuire testified that about 4:30 a.m. on April 12, 1986, he and his partner, Nicholas Tristano, responded to a radio transmission indicating that a man had been shot in the alley at 6132 South Damen. The officers arrived on the scene about two minutes later, but found no one in the alley. Upon learning that the call for help had been made from 6148 South Damen, McGuire and Tristano went to that address, where Cloverene

Collins responded to their knock on the door. McGuire testified that when he inquired about a shooting victim, Collins pointed to defendant, who was sitting at the kitchen table, and stated that defendant's husband had been shot. Defendant then said "I did it. I shot my husband." McGuire then advised defendant of her *Miranda* rights and placed her under arrest.

McGuire testified further that defendant told the officers where they could find the gun that had been used to shoot the victim. Officer Tristano followed defendant's directions and recovered from a bedroom in Collins' home a .38 caliber handgun which was inside a "Crown Royal" bag. Each of the gun's five chambers was loaded. Two of the chambers contained live rounds of ammunition, and three contained spent shell casings. Defendant, who had been dressed in a housecoat, was permitted to change into street clothes and was then taken to the police station. McGuire testified that they had not received any other calls earlier that night involving the defendant and the victim.

The testimony of Officer Nicholas Tristano fully corroborated that of Officer McGuire. Tristano identified the gun and the "Crown Royal" bag which he had recovered from the bedroom in Collins' home on April 12, 1986.

The evidence established that the weapon recovered by Tristano and McGuire had discharged the bullet which had caused the victim's death and was registered to the victim.

Chicago police detective Nick Crescenzo testified that after defendant had been arrested, he saw her at the 7th District police station and advised her of her *Miranda* rights. He then questioned defendant about the shooting and transcribed her answers. After he read the statement back to defendant, she signed it. At the time the detective took the statement from defendant, he did not observe any discoloration or scratch marks on her neck which would have indicated that she had been choked by another.

In the statement given to Crescenzo, defendant stated that she had been staying at her sister's home at 6148 South Damen. When she came home at about 2:30 a.m. on April 12, 1986, her husband started choking her, and "[she] was fearing for [her] life." She then went to her sister's home, and the victim came there and began choking her again. She went back to her home, and he started choking her some more. She took a gun from underneath a mattress and shot him. Defendant also stated "I have had 28 years of the same thing. I am tired of it."

Assistant State's Attorney Harry Semrow testified that he first saw defendant at the police station at about 9:15 a.m. on April 12, 1986. After Semrow had advised defendant of her *Miranda* rights, she told him that because of "an ongoing domestic dispute," she had been staying with her sister, Cloverene Collins, in her home at 6148 South Damen for approximately one week.

Defendant also told Semrow that on April 11, 1986, she had been at work from 3:30 p.m. until midnight. She returned to her home at 6132 South Damen at about 2:30 a.m. on April 12, 1986, and saw the victim washing his car out in the alley. He told the defendant to just leave her car in the alley and that he would move it into the garage later. The victim came into the house about five minutes later and asked defendant to remove her clothing from the house because she was no longer living there. The two argued, and during the course of this argument, the victim choked defendant for a few seconds. When the argument was over, defendant went to Collins' home down the street. While she was in Collins' basement, the victim arrived, carrying an armload of her clothes. Collins let the victim into the house, and he went down to the basement, where another argument ensued between him and the defendant. The victim began to choke defendant again. Collins separated them, and the victim then left and returned home.

Defendant thereafter put on her coat and followed the victim home. Defendant heard the victim inside as she stood in the gangway outside the side door. Defendant walked toward the backyard and waited until she heard the victim leave the house. She then entered the house through the back door and went to the kitchen area. Once inside, defendant retrieved a handgun from underneath the mattress in her daughter's bedroom, which was adjacent to the kitchen.

When the victim returned to the house, defendant drew the weapon and told him not to come in there "messing with [her]." When the victim began to move toward her, defendant pointed the gun at him. The victim then turned around, and while he was walking away from her, defendant fired the gun at him from a distance of about 10 feet. The victim continued walking out of the house and into the alley. Defendant followed him outside and fired one or two more shots at him. These last shots were from a distance of about 20 to 25 feet.

Assistant State's Attorney Semrow noted that there were bruises on defendant's neck which were consistent with defendant's statement that the victim had choked her.

At the close of the State's case in chief, defense counsel moved for a finding of not guilty, asserting that defendant had acted in self-defense. The trial judge denied the motion, noting that he did not "know what the defense [was] going to be." Thereafter, defense counsel informed the court that Curtis O'Banner, the adult son of the defendant and the victim, intended to take the stand and to testify that Curtis O'Banner shot the victim on April 12, 1986.

The defense called Darlene O'Banner, the adult daughter of defendant and the victim. Darlene stated that about 12 days before her father's death, she was at her parents' home and saw bruises on defendant's neck and observed overturned furniture in the kitchen. Defendant's hair was in disarray, and she looked as though she had been in a fight. Defendant told her daughter that she was "going to leave."

Darlene testified further that she had seen her parents have such fights many times. About six or seven months before her father's death, Darlene saw her father threaten to kill defendant as he held a gun to her head. On one occasion when Darlene was a child, she saw her father strike her mother with a gun. When these fights took place, her mother, the defendant, left home and stayed down the street with her sister, Cloverene Collins, until the victim had calmed down. Darlene left home "at the age of 16 because of the way [her father] was." On a number of occasions she called the police, who came to the house but did not arrest her father.

Darlene stated that about two weeks before her father's death, her parents had an argument about whether she should be allowed to move back into their home. The victim was opposed to her return and said that no one paid attention to his wishes. He also said that "sometimes he [felt] like he should just kill everybody in the whole house."

On cross-examination, Darlene testified that she was not present when her father was shot. She was with a friend and learned of the shooting when she received a telephone call after the incident occurred. She went home and followed the paramedics and her father to the hospital, where she stayed until her father was pronounced dead. Darlene stated further that she was the only family member present at the hospital and that she had provided the hospital all the pertinent information on her father. On redirect examination, Darlene stated that her father had previously been arrested "for beating up [her mother]," and he had been under court-ordered "peace bond a couple of times."

The defense also called Cloverene Collins, the sister of the defendant, who testified that she had lived at 6148 South Damen for 20 years. Collins also testified that on many occasions defendant had come to stay in her home temporarily because of the victim's physical attacks on defendant. Many times Collins noticed bruises, scratches, and bumps on defendant's head and stated that this had been going on since the marriage of the defendant and the victim in 1961.

On April 12, 1986, defendant had been living with Collins for about two weeks. At about 4 a.m., the victim rang her doorbell and asked to see the defendant, who was in the basement bedroom which she had been using for two weeks. Collins allowed the victim to enter her home, and he went downstairs. A few seconds later, Collins ran downstairs because she heard some noises. The victim was choking the defendant and was threatening to kill her. Collins separated the two and told the victim to leave. Collins then called the police, but they did not respond.

About 15 minutes after the victim left, he returned, carrying an armload of defendant's clothes. He threw the clothes on the bed in the basement bedroom, left, and repeated this conduct with additional clothes about 10 minutes later. Thereafter the victim again attacked the defendant and chased her upstairs to Collins' kitchen. They ran outside the house, and the victim caught hold of the defendant in the gangway, which was less than five feet wide. The victim was choking defendant and was hitting her head against the house. Collins separated them, and defendant started to run away.

Collins, who was wearing only a housecoat, then went inside her house to get a coat. A very short time later, she heard shots and went outside, where she saw the victim in the alley behind the house. The victim said he had been shot and requested some water. Collins went inside and dialed 911 to call an ambulance. When she went back outside, the victim was walking down the alley.

On cross-examination, Collins stated that during the 28-year marriage of the victim and the defendant, she had never seen the defendant cause any of the numerous altercations. In response to the prosecutor's questions, Collins denied any knowledge that the defendant had been "fooling around" with a person named Wheeler and denied any knowledge that defendant had gone out to dinner after work on April 12, 1986.

After Collins left the stand, defense counsel and defendant informed the court that, on advice of counsel, defendant would not testify in her own behalf. Immediately thereafter, the prosecutor re-

quested that Collins be recalled because he had forgotten to ask a series of questions challenging Collins' credibility and indicating bias on the part of the witness. Upon being recalled, the prosecutor asked Collins whether defendant was the sole beneficiary of a policy insuring the victim's life. Defense counsel objected, and the trial court immediately sustained the objection and instructed the jury to disregard the prosecutor's last question and comments.

The defense then called Dr. Conrad May, who testified that defendant had been his patient since 1975. In 1979, Dr. May observed swelling and bruises on defendant's chest, prescribed pain medication, and advised defendant not to work for about a week. From 1979 to 1986, he saw defendant on approximately 20 to 25 occasions for a variety of different reasons. On April 13, 1986, the day after the victim's death, Dr. May saw defendant and observed severe swelling and bruises on her neck as well as swelling and bruises on her head. In his opinion, those injuries were "of such magnitude to cause death or great bodily harm" if they had been continued.

On rebuttal, the State called police detective Nick Crescenzo, who testified that a review of the Chicago police department files indicated that the victim had never been arrested in the City of Chicago. Crescenzo stated on cross-examination that he had not examined police records throughout the State of Illinois and that he did not know whether the records of the City of Chicago reflected issuance of a summons in a domestic dispute where no arrest had been made.

The State also called paramedic Robert Landers, who testified that after he and his partner had transported the victim to the hospital, they observed a female family member give hospital personnel the pertinent information on the victim. Landers stated further that this woman said that defendant had shot the victim.

Although the record does not contain a recorded instruction conference, the trial judge instructed the jury after instructions had been tendered by counsel. The jury found defendant guilty of murder. Defendant subsequently obtained new counsel and brought a motion for a new trial.

At the hearing on defendant's motion for a new trial, Curtis O'Banner, the 25-year-old son of defendant and the victim, testified about the victim's many previous physical attacks on and threats to kill the defendant. He also stated that he knew the victim owned a .38 caliber handgun and that the victim sometimes carried the weapon with him.

Curtis testified further that he lived with his parents at 6132 South Damen, and on April 11, 1986, he had gone to sleep at about 11 p.m. At about 4 a.m. on April 12, 1986, he received a telephone call from the defendant, who told him that the victim "was beating her up again." After he hung up the telephone, Curtis got dressed and walked to the home of his aunt, Cloverene Collins. There, he saw his parents standing outside the house in the gangway, which was about six feet wide. The victim was choking the defendant, and Curtis then ran up to the victim and jumped on his back to get him away from the defendant. He felt a gun in the victim's right hip pocket, and the victim tried to pull the gun out. The victim let go of the defendant, and she fell to the ground. The two men struggled as Curtis grabbed the gun, and they fell against the house next door.

Curtis testified further that while both he and his father were facing west, he fell down while holding the gun, and the gun discharged once as the victim lunged back toward Curtis. The victim yelled that he had been shot and started walking west through the gangway toward the alley. Curtis then saw the victim walk, in his normal gait, north down the alley and turn into the gangway at 6132 South Damen. Curtis then handed the gun to the defendant, called the victim's sister, and went for a walk by himself. Curtis had not intended to shoot his father, but it happened so quickly that he did not know he had shot the victim.

Curtis testified that a couple of days after the shooting he had told the defendant's lawyer, James Montgomery, that he had shot the victim. James Montgomery instructed Curtis to meet with an attorney, Stephen Komie, and to give him a statement. Curtis met with Komie and gave him a full statement about a week after the shooting. Curtis subsequently told the defendant's trial counsel that he had shot the victim and indicated that he was willing and eager to testify on behalf of the defendant. Defense counsel subpoenaed Curtis as a witness at defendant's trial and recommended that Curtis be represented by separate counsel. Defense counsel referred Curtis to Marshall Weinberg, who met with Curtis prior to defendant's trial. Curtis told Weinberg that he had shot the victim.

Curtis stated that he first told defendant's attorneys in April 1986 that he had shot the victim. During defendant's trial in April 1989, he waited outside the courtroom in the hallway expecting to be called as a witness.

Alberta Walker, the sister of the defendant and of Cloverene Collins, testified that she was present when Curtis told defense counsel and attorneys Montgomery and Weinberg that he had shot the vic-

tim. All of these conversations had occurred before the defendant's trial began. Walker testified further that she had told defendant's trial counsel that Montgomery had a tape of a telephone conversation on April 12, 1986, between Cloverene Collins and someone at the police station. Walker also told defendant's trial counsel about a restraining order against the victim, issued May 27, 1980, in a separate maintenance suit, enjoining him from physically assaulting the defendant.

Finally, defendant testified about the many physical attacks she had suffered at the hands of the victim during their 28-year marriage. She also described the events of April 12, 1986. Defendant stated that she got off work at 12:30 a.m. and then drove a coworker home. When defendant arrived home, she parked her car and left her dirty clothes in her own home at 6132 South Damen. Defendant testified that she never actually went into her own home that night, but just opened the door and threw her dirty clothes inside. She then walked to Collins' house and went to sleep. The victim came to Collins' home at about 4 a.m. and began attacking her, and Collins put him out of the house. Defendant dialed 911 for help, but the person who answered hung up. The victim returned a few minutes later and started attacking defendant and threatening to kill her. Defendant dialed 911 again and told someone at the police station that her husband was beating her.

Defendant testified that because the police never came, she called her son, Curtis, for help. The victim then dragged her outside of Collins' home, and started banging her head against the house. He also started choking her, and she "passed out for a second." When she awoke, she saw the victim and Curtis walking through the back gate toward the alley. Defendant then walked to the gate, and after Curtis gave her the gun, she walked back to Collins' house and called the police.

Defendant stated that she did not shoot the victim and did not remember hearing a shot. She also testified that she had told this same story to defendant's trial counsel and to attorney James Montgomery. Defendant stated that when she was questioned by the police and the assistant State's Attorney, she had lied and admitted shooting the victim in order to protect her son. Defendant told both defendant's trial counsel and Montgomery that she had lied to the authorities in order to protect her son. She testified further that her trial counsel was aware of the restraining order issued against the victim in 1980 and was aware of the existence of the tape-recorded conversation of her requesting help from the police.

The State presented no witnesses at the hearing on defendant's motion for a new trial.

In denying the motion, the trial judge stated that although the transcript could not be found, a recorded jury instruction conference had been held. The judge stated that he believed the testimony of Curtis O'Banner was totally incredible and inconsistent with the evidence presented at trial. The court also indicated that Curtis waited three years before coming forward with this evidence and that defendant's testimony at the hearing on the pretrial motion to suppress was inconsistent with her testimony at the hearing on the motion for a new trial. The court found no prosecutorial misconduct, found no incompetence on the part of the defendant's trial counsel, and found that the defendant had not presented any new evidence. Accordingly, the court denied defendant's motion for a new trial and sentenced her to a term of 20 years, the minimum sentence allowable for a conviction of murder.

Defendant initially claims that she was deprived of effective assistance of counsel, asserting, *inter alia*, that her attorney provided incompetent representation where he failed to call defendant or defendant's son as witnesses, failed to introduce evidence of a prior restraining order issued against the victim to protect the defendant, and failed to introduce a tape of defendant's telephone conversation requesting help from the police prior to the shooting.

■■ ■ It is established that the inadequacy of a defendant's trial counsel entitles him to a new trial if counsel was actually incompetent, as reflected in the performance of the duties of a trial attorney, and if this incompetence produced substantial prejudice to the defendant without which the result of the trial would probably have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504, 525-26, 473 N.E.2d 1246, 1255-56, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061.) Where a defendant's attorney is aware of exculpatory evidence but does not present it, courts have found incompetence of counsel and prejudice to the accused. *People v. Garza* (1989), 180 Ill. App. 3d 263, 535 N.E.2d 968; *People v. Solomon* (1987), 158 Ill. App. 3d 432, 511 N.E.2d 875; *People v. Bell* (1987), 152 Ill. App. 3d 1007, 505 N.E.2d 365.

Defendant asserts that her trial counsel was incompetent by failing to call her or her son, Curtis, to the stand to establish that defendant had not shot the victim at all and that Curtis had fired the shot that killed the victim. Defendant also urges that she should have been called in order to explain to the jury that her post-arrest state-

ments were false and that she had lied to the authorities in order to protect her son. We agree.

The record reveals that in her answers to the State's discovery requests, defendant indicated that she was not the one who shot the victim. Immediately before the trial commenced, defendant's trial counsel advised the court that the defendant would testify and stated that self-defense would not be interposed at trial as the defense for his client's conduct. During trial, defense counsel again informed the court during a side-bar that he did not intend to argue self-defense on defendant's behalf and that Curtis O'Banner would be called to testify that he shot the victim. Yet, defendant's counsel never presented any evidence to support this theory of defense and did not withdraw or amend her answers to the State's discovery requests. Counsel never called Curtis to the stand and advised defendant not to take the stand in her own behalf.

At the motion for a new trial, defendant testified that she had told her trial counsel and attorney James Montgomery that she did not shoot the victim. Curtis O'Banner testified that he also told defense counsel and attorney Montgomery that he had fired the shot that killed the victim. Alberta Walker testified that she was present when Curtis told defendant's trial counsel and attorneys Montgomery and Weinberg that he had shot the victim. The State failed to call defendant's trial counsel Montgomery, or any other witness to refute the testimony of the defendant, Curtis, or Alberta Walker at the hearing on the post-trial motion. Moreover, defendant's trial counsel was not called to explain why he did not call Curtis. Consequently, the unrebutted testimony of defendant, Curtis O'Banner, and Alberta Walker at the hearing on the post-trial motion must be accepted.

■ Although the trial judge believed that Curtis' testimony at the hearing on the motion for a new trial was not credible, the determination of whether to believe that testimony should have been left to the jury, and trial counsel should have introduced the evidence so the jury could review it along with all of the other evidence presented. Under these circumstances, defense counsel should have called defendant and Curtis O'Banner to the stand and let the jury choose to believe or reject their version of the events on the night of the shooting. We find that the failure to call defendant and Curtis O'Banner to the stand to present this exculpatory evidence constituted ineffective assistance of counsel.

■ In addition, we note that in denying the motion for a new trial, the trial court also indicated that Curtis waited three years before coming forward with this evidence. The testimony of Curtis and

Alberta Walker indicates that shortly after defendant's arrest Curtis told Montgomery that he had fired the fatal shot. They also testified that he told defendant's trial counsel well before trial that Curtis shot the victim and that he was present and available to testify but was never called as a witness at trial. The State never called defendant's trial counsel or Montgomery to refute this testimony, and therefore, this evidence stands unrebutted. Consequently, the trial court's conclusion that Curtis waited three years to come forward is not supported by the evidence in the record.

Defendant also contends that trial counsel was incompetent by failing to introduce evidence of the tape of defendant's call requesting help from the police prior to the shooting and by failing to introduce evidence of a prior restraining order issued against the victim for the protection of the defendant.

■ Although defendant testified at the hearing on her motion for a new trial that she dialed 911 to request help from the police prior to the shooting, defense counsel presented no evidence at trial indicating that she had placed this call. Defendant's testimony was corroborated by Alberta Walker who stated at the hearing on the post-trial motion that Montgomery had a tape of the call to the police. Because this testimony was not refuted by defendant's trial counsel, Montgomery, or any of the State's witnesses, we must accept it as unrebutted evidence. This evidence would have corroborated the proffered testimony of the defendant that she was being beaten and would have contradicted the testimony by McGuire that no other calls had been received from defendant earlier that night. Defense counsel was aware of this evidence which would have benefitted his client, but he failed to produce it at trial. The failure to present such evidence constitutes ineffective assistance of counsel. *Garza*, 180 Ill. App. 3d 263, 535 N.E.2d 968; *Solomon*, 158 Ill. App. 3d 432, 511 N.E.2d 875; *Bell*, 152 Ill. App. 3d 1007, 505 N.E.2d 365.

■ We also find that evidence of the prior restraining order issued against the victim would have supported a claim of self-defense. The failure of defendant's attorney to introduce evidence of the restraining order constituted ineffective assistance of counsel. *Garza*, 180 Ill. App. 3d 263, 535 N.E.2d 968; *Solomon*, 158 Ill. App. 3d 432, 511 N.E.2d 875; *Bell*, 152 Ill. App. 3d 1007, 505 N.E.2d 365.

Based upon the foregoing, we hold that defense counsel did not adequately represent the interests of the defendant.

■ The State has argued in its petition for rehearing that it was prevented from calling defendant's trial counsel to testify at the hearing on the motion for a new trial. The State bases its argument

upon the doctrine of the attorney-client privilege and claims that this privilege would have precluded defendant's trial counsel from giving testimony as to his trial strategies. We find the argument unpersuasive.

Where a defendant has asserted ineffective assistance of counsel and thereby put in issue the substance of communications between herself and her attorney, the defendant has waived the attorney-client privilege, and it is not error for the trial court to allow counsel to testify as to conversations with the defendant. See *People v. Romero* (1984), 128 Ill. App. 3d 461, 470 N.E.2d 1080; *People v. O'Connor* (1976), 37 Ill. App. 3d 310, 345 N.E.2d 520.

In addition, where a defendant has taken the stand and testified as to portions of conversations with her attorney, this conduct amounts to a waiver of the attorney-client privilege as to the remainder of the conversation or communication about the same subject. In such a situation, it is proper for the trial court to allow the attorney to be called and examined about the substance of these conversations. (*O'Connor*, 37 Ill. App. 3d at 314-15, 345 N.E.2d 520.) We note that both defendant and Curtis O'Banner testified at the hearing on the motion for a new trial that they had advised defense counsel of the exculpatory evidence. Consequently, we find that defendant has waived her right to assert the attorney-client privilege, and the State was not precluded from calling defendant's trial counsel as a witness at the hearing on the motion for a new trial.

Defendant next argues that she was deprived of a fair trial by the prosecutor's improper cross-examination of her sister, Cloverene Collins, and by his closing argument which referred to that cross-examination.

The record indicates that during cross-examination of Collins, the prosecutor questioned her about her acquaintance with a man named "Wheeler." He also asked Collins whether she had any knowledge that the defendant had been "fooling around" with a person named "Wheeler." Collins denied having any such knowledge and denied any knowledge that defendant had gone out to dinner after her work shift on April 12, 1986. He then asked her a series of questions designed to indicate to the jury that defendant's work shift ended at midnight, that she lived approximately five minutes away from her work place, and that she did not arrive home until about 2:30 a.m. on the night of the shooting.

These questions were deliberate and blatant attempts by the State to create the impression that defendant was involved in an extramarital affair with a man named Wheeler. The State never intro-

duced any evidence on rebuttal to support such an inference. Yet, during closing argument, the prosecutor referred to the testimony of Collins and argued that she had lied to protect the defendant by testifying that on the night of the shooting defendant "wasn't out doing anything she wasn't supposed to be doing." This argument was an entirely improper attempt to challenge the credibility of Collins by indicating to the jury that Collins had lied about a fact which had never been proven and was wholly unsupported by the evidence in order to protect defendant.

The State argues that this questioning and argument was proper to challenge the credibility of Collins and to establish her motive to testify falsely. We do not agree.

■ Error occurs when the State, on cross-examination, asks a defense witness questions, presuming facts not in evidence, as a precursor to impeachment of that witness, in the absence of rebuttal evidence to substantiate the inquiry. (*People v. Braggs* (1988), 184 Ill. App. 3d 756, 760, 540 N.E.2d 767, 769; *People v. Rivera* (1986), 145 Ill. App. 3d 609, 619, 495 N.E.2d 1088, 1095.) The danger inherent in such questioning is that the jury will ignore any denial, presume the accuracy of the questions' insinuation or innuendo, and substitute that presumption for proof. *Braggs*, 184 Ill. App. 3d at 760, 540 N.E.2d at 769; *Rivera*, 145 Ill. App. 3d at 619, 495 N.E.2d at 1095.

■ The State failed to present any rebuttal evidence of defendant's alleged infidelity. Thus, the earlier cross-examination of Collins by the State on this subject was clearly improper, and we find that the unfounded insinuations that Collins was unbelievable or lying constituted prejudicial error. *People v. Redman* (1985), 135 Ill. App. 3d 534, 542, 481 N.E.2d 1272, 1278.

The record also indicates the prosecutor cross-examined Collins about the defendant's entitlement to benefits under a policy insuring the life of the victim. Prior to trial, defense counsel made a motion *in limine* seeking to bar any testimony concerning an insurance policy on the life of the victim. Although the prosecutor told the court that life insurance would not be mentioned in opening statement or during the State's case in chief, he indicated that the question of life insurance "may become important" to the State during the cross-examination of some of the defense witnesses or on rebuttal.

After Collins testified on direct and under cross-examination and had left the stand, the prosecutor requested that she be recalled because he had forgotten to ask a series of questions challenging Collins' credibility and indicating bias on her part. Upon being recalled, Collins was asked by the prosecutor whether defendant was the sole

beneficiary of an insurance policy covering the victim's life. Defense counsel objected, and the trial court sustained the objection, instructing the jury to disregard the prosecutor's last question and comments.

Although the trial court sustained defense counsel's objection to this line of questioning, the jury had already heard the question, and the damage had been done. The State has argued that the questioning as to defendant's entitlement to the proceeds of a life insurance policy on the victim was proper to challenge the credibility of Collins and to establish her motive to testify falsely. We do not agree. We find that the prosecutor's cross-examination of this issue was yet another deliberate attempt to bring before the jury improper and inadmissible evidence about the defendant and her motive for shooting the victim. Consequently, we find that it was error for the prosecutor to question Collins about defendant's entitlement to insurance benefits.

Defendant has also argued that she was deprived of a fair trial by the prosecutor's improper cross-examination of her daughter, Darlene O'Banner, and by his attack on her character during closing argument.

The defense called Darlene O'Banner, the adult daughter of defendant and the victim, to show the victim's propensity for violence toward the accused over their 28-year marriage. Darlene was not an occurrence witness. Yet, the prosecutor cross-examined her on several matters which were not brought out on direct and were prejudicial to the defendant, including (a) whether Darlene paid any attention to where in the house the victim's gun was kept; (b) whether the gun was loaded; (c) whether Darlene's daughter, eight years old at the time of the shooting, had any access to the gun; and (d) the name, sex, and address of the friend with whom Darlene was visiting in the early morning hours of April 12, 1986, when she learned that her father had been shot.

The State erroneously contends that this questioning was proper to challenge the credibility of Darlene O'Banner.

As previously noted, error occurs when the State, on cross-examination, asks a defense witness questions, presuming facts not in evidence, as a precursor to impeachment of that witness, in the absence of rebuttal evidence to substantiate the inquiry. (*Braggs*, 184 Ill. App. 3d at 760, 540 N.E.2d at 769; *Rivera*, 145 Ill. App. 3d at 619, 495 N.E.2d at 1095.) The danger inherent in such questioning is that the jury will ignore any denial, presume the accuracy of the questions' insinuation or innuendo, and substitute that presumption for proof.

*Braggs*, 184 Ill. App. 3d at 760, 540 N.E.2d at 769; *Rivera*, 145 Ill. App. 3d at 619, 495 N.E.2d at 1095.

The questions noted above were improper. Contrary to the State's assertions, the questions did not appropriately challenge Darlene's credibility because they brought to the attention of the jury facts which were not in evidence and were not presented through rebuttal. These questions did not provide evidence which impeached Darlene's testimony. Consequently, the prosecutor should not have been permitted to pursue this line of questioning.

During closing argument, the prosecutor argued that Darlene O'Banner's testimony was "tainted" by the fact that she did not get along with the victim. He argued further that "society is fraught with the danger of drugs and gangs and crimes *** and [the victim] was trying to look out for [Darlene]." The prosecutor also argued that the victim could not control Darlene when she was 16 years old, and although he struck Darlene on occasion, he imposed only reasonable restrictions and punishments on her while she was growing up.

We find that this was improper argument because it was not based on facts appearing in evidence or on legitimate inferences deduced therefrom. (*People v. Halteman* (1956), 10 Ill. 2d 74, 139 N.E.2d 286.) In light of the improper and prejudicial argument by the prosecutor and the fact that the State's case was not overwhelming, we hold that the prosecutor's improper argument constituted prejudicial error.

We hold that the cumulative effect of the errors occurring during her trial requires that defendant be afforded a new trial. Based upon our decision that defendant is entitled to a new trial, we need not address the other issues raised by her on appeal.

For the foregoing reasons, defendant's conviction and sentence are reversed, and the cause is remanded for a new trial.

Reversed and remanded.

McNAMARA and EGAN, JJ., concur.