2020 IL App (1st) 171486-U

FIFTH DIVISION
March 31, 2020

No. 1-17-1486

**NOTICE:**  This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14 CR 1778 |
| IMAN FRISON, | ) ) | |
| Defendant-Appellant. | ) ) | Honorable Vincent M. Gaughan, Judge presiding. |

JUSTICE DELORT delivered the judgment of the court.
Presiding Justice Hoffman and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held:*  Defendant's attorney did not render ineffective assistance of counsel for failing to disclose *Lynch* evidence before trial.  Defendant's sentence is not an unconstitutional *de facto* life sentence.  Affirmed.

¶ 2    Following a jury trial, defendant Iman Frison was convicted of first-degree murder and sentenced to 47½ years' imprisonment.  Defendant appeals, contending that (1) his attorney rendered ineffective assistance for failing to disclose evidence pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984), which would have allowed defendant to testify in support of his self-defense

claim that he had previously seen the victim's friend with a gun and (2) his 47½-year sentence is an unconstitutional *de facto* life sentence. We affirm.

¶ 3                                              BACKGROUND

¶ 4      Defendant was charged in a multi-count indictment with first-degree murder in connection with the shooting death of Andre Hunter.[1] The State's theory at trial was that defendant shot the victim because the victim and his friend, Jordan Moore, were not from the area where the shooting occurred. Defendant asserted at trial that he shot the victim in self-defense.

¶ 5      Before trial, defendant filed a motion seeking to admit evidence pursuant to *Lynch* regarding two prior incidents involving the victim and one prior incident involving Moore, both of which defendant argued would support his defense of self-defense by showing the victim's and Moore's propensity for violence. The two incidents regarding the victim included an arrest in November 2006 for mob action, and another arrest in March 2012 for assault. The incident regarding Moore related to an arrest in May 2014 for aggravated assault. The circuit court granted defendant's motion over the State's objection.

¶ 6      At trial, Moore testified that, at around 2:30 p.m. on December 19, 2013, he and the victim left school and went to the area of West 79th Street and South Vincennes Avenue. There, they went to a corner store to purchase "snacks" and "little goodies." While they were in the store, an individual they knew from the neighborhood as "Tank" shook their hands and said "What's up" to them. Moore said there was no other interaction with Tank. After making their purchases, they walked north along South Stewart Avenue toward West 75th Street.

¶ 7      At around West 77th Street, defendant ran up behind them and called out to them, "Yo, yo, yo." Moore said he and Hunter stopped because they thought it was someone they knew. As

---

[1] In various parts throughout defendant's opening brief, the victim's last name is misspelled as "Houston."

defendant approached, Moore and Hunter realized they did not know this person. Moore saw, however, that defendant had a gun in the waistband of his pants.

¶ 8    According to Moore, defendant pulled out the gun and asked them if they were from "75th Wuga world," which Moore explained was the area of 75th and Stewart. Moore responded that they were not from that area but had grown up and were from "this" area (*i.e.*, 79th and Stewart). Defendant then pointed the gun at the victim's chest, but the victim used his hand to move the gun away from his chest. At that point, Tank (the individual they met at the convenience store) approached them and told defendant, "Don't let him touch that gun, pop his *** ass."

¶ 9    Moore and the victim started to flee the area, but the victim slipped on some ice and snow and fell. The victim had his hand out to defendant, who was standing over and to the right of the victim. Moore saw defendant shoot the victim three times, heard the gun "click" twice because it jammed, and then saw defendant shoot two additional times. Defendant and the other individual then fled toward 79th Street.

¶ 10    Moore confirmed that neither he nor the victim had any weapons. Moore then called the police and felt the victim's neck to see if he was still breathing. Moore said the victim was not breathing, so he placed his hand on the victim's chest to make sure. Moore said that he heard the victim's last heartbeat, which he described as "just a little beat," before the victim died at the scene. After about ten minutes, police arrived and spoke to Moore. On the next day, Moore went to the police station and identified defendant in a lineup. On cross-examination, Moore denied that the victim "swatted" defendant's gun away. The victim only "lightly pushed the gun away."

¶ 11    Flynnard Turner then testified that he was a bus operator for the Chicago Transit Authority (CTA), and at around 2:30 p.m. on December 19, 2013, he was standing at the intersection of West 78th Street and Vincennes waiting to begin his second shift. Turner saw a group of four to six

individuals walking north along Stewart. The group walked out of his line of sight, and about one minute later, Turner then heard four to six gunshots. The shots came from the direction that the group had been walking. Turner then ran across the street to the bus garage and saw the same individuals running south in the same direction that had come from. Turner called the police, but while on the phone, he noticed a "detective car" driving down the street, so he flagged it down. He told the officers what he observed, and he added that one of the individuals who had "dreads" was "fumbling" with the front of his jacket as he ran. Turner, however, could not see the person's face and was unable to identify any individual in a subsequent photographic lineup.

¶ 12     Chicago police officer Eric White then testified that, at around 2:30 p.m. on December 19, 2013, he and his partner, officer Sean McDermott, were driving south on Vincennes from West 76th Street when they were flagged down by a CTA bus driver. The driver told them what he had observed, and White stated that he saw defendant running southbound on Vincennes while holding his waistband as if holding onto something. White and his partner gave chase. White eventually caught defendant and tackled him. The officers placed defendant under arrest, and when they stood defendant up, a large revolver fell from defendant's waistband. White further testified that other officers recovered the weapon and transported defendant to the police station.

¶ 13     Dr. Marta Helenowski, an assistant Cook county medical examiner, testified as an expert witness in the field of forensic pathology. Dr. Helenowski stated that she performed the autopsy on the victim, and she observed five gunshot wounds. The victim had through-and-through gunshot wounds on each forearm. The victim also had a gunshot wound that entered the right upper chest and exited on the left side of the chest, perforating the heart and causing a "massive hemorrhage in the chest cavity." Dr. Helenowski also observed a "non-penetrating," superficial gunshot wound to the left abdomen, which only entered the skin and subcutaneous tissue but not

any of the body cavities. Finally, Dr. Helenowski found a gunshot wound that entered the left lower back of the victim and exited on the right side of the chest. Dr. Helenowski confirmed that the gunshot entered the back and exited the front of the victim's body, and that there was no evidence of close-range firing (*i.e.*, within about 12 inches). The manner of death was homicide caused by multiple gunshot wounds.

¶ 14    Chicago police sergeant Kevin Norris testified that he administered a gunshot residue test on defendant at around 4:50 p.m. on December 19, 2013. Norris and a partner also recovered a revolver from the crime scene, which had five spent cartridge cases and an empty sixth chamber. Robert Berk testified that, on December 20, 2013, he was a trace evidence analyst with the Illinois State Police. Berk stated that he analyzed the gunshot residue tests administered on defendant and concluded that defendant's right hand tested positive for gunshot residue. The State then rested.

¶ 15    Defendant testified on his own behalf. He stated that, on December 19, 2013, he was 18 years old. He stated that he had lived in that area with his family until around 2000, but the area became "very violent," so they moved to the neighborhood of East 72nd Street and South Ridgeland Avenue. On the day of the murder, defendant said that he had spent the prior night at his great aunt's home, who still lived in the area. That afternoon, defendant left to go to a friend's house in the neighborhood, where they smoked marijuana for a couple of hours.

¶ 16    Afterwards, defendant said he went to wait for a bus to go home. Defendant admitted that he was carrying a gun with him but did so only to protect himself because he had been attacked in the past, most recently about two months prior to the victim's murder when he was at school. Defendant added that he would only carry the gun in that area because of the prior attacks. Defendant said that he purchased the gun on "the street" from an individual he knew as "T."

¶ 17     Defendant said that, while he was waiting for a bus, he saw Moore—whom he knew from grade school—walking toward him in a group of between seven to nine other people.  After they greeted each other, Moore said he wanted to speak to defendant.  Defendant said that he and Moore were not on good terms because defendant had dated Moore's sister in the past, and Moore had threatened to "beat [defendant's] ass" if defendant did not stop dating Moore's sister.  Defendant, however, did not fear Moore because defendant said that, in response to Moore's threats, defendant stopped dating Moore's sister.  Defendant then crossed the street to Moore's location because defendant thought they were going to "smooth things out."

¶ 18     When defendant caught up to Moore and the group, Moore asked defendant if he was still talking to Moore's sister.  Defendant said he was not, and the victim said to Moore, "Why the *** you still talking to him?"  According to defendant, the victim then walked up and punched him.  Defendant said he only knew Moore and had never seen the victim or any of the other individuals in the group before.

¶ 19     Defendant stumbled back a few feet and heard Moore tell the victim to "beat [defendant's] ass."  The victim then came toward defendant.  Defendant pulled his gun out of his waist and heard Moore tell the victim, "[D]on't let him get that gun."  Defendant said the other individuals in the group were approaching him from the left and right, eventually surrounding him.

¶ 20     At that point, defendant stated that the victim took a hold of defendant's left shoulder and right wrist.  Defendant confirmed that he was holding the gun with his right hand.  Defendant then fired because he feared for his life.

¶ 21     Defendant stated that, although he did not see Moore with a gun at that time, he had seen Moore with a gun before.  When his trial counsel asked whether it was only once or on more than

one occasion, the State objected, arguing that the testimony had not been disclosed in defendant's pretrial motions. The following discussion then took place in a sidebar conference:

"[Assistant State's Attorney]: Judge, there was extensive litigation on the issue of *Lynch*. There is nothing that was filed by the defense with regard to any prior gun possession on the part of Mr. Moore. This is the first time that it is being addressed.

Judge, we would object given when it's being broached. It was not in any of the pretrial motions and furthermore, simple gun possession, it doesn't rise to the level of *Lynch*. We would object to this being offered at this time based on those reasons.

THE COURT: What's your response?

[Defense Counsel]: I think it comes in as reputation in the community for having a gun.

THE COURT: No, come on now. Don't be doing that. All right. Why wasn't it put in your motion for *Lynch* material?

[Defense Counsel]: We didn't anticipate using it.

THE COURT: Okay. Then, you know, I wouldn't let State do it to you and I am not letting you do it to them."

The court then ordered defendant's answer that he had previously seen Moore with gun stricken and directed the jury to disregard that answer.

¶ 22    Defendant could not remember how many times he fired the weapon but agreed that he kept firing until it could no longer fire. Defendant said that the victim was standing when he fired

7

his weapon and was not lying on the ground. Defendant did not see what happened to the victim after firing the gun.

¶ 23    Defendant said that, after he finished firing the gun, he ran back towards 79th Street for "safety to just get away." Defendant said no one was running with him or behind him. Defendant also stated that, although he "crossed paths" with police officers while he was fleeing, he did not stop and ask them for help because "it was just at the moment I never got the time to even think about it." Defendant said there was no other reason he did not speak to officers at the time. Defendant denied intending to shoot someone that day, wanting to fire the gun, or wanting to harm either Moore or the victim.

¶ 24    On cross-examination, defendant stated that "T," the individual from whom he bought the gun, was not Tank. Defendant conceded that the most recent incident in which he was attacked at school took place downtown and not in the neighborhood where the shooting took place. Defendant further conceded that neither the victim nor Moore was the individual who had attacked defendant in an earlier incident outside "the gyro place on 79th Street." Defendant also agreed that, although he purchased the gun for protection because of the two prior incidents, he nonetheless kept the gun at his great aunt's house at "[West] 80th [Street] and Stewart" and would have to walk from the bus stop at 79th Street—where the prior incident took place—to that location. Defendant further conceded that, although he testified that he only needed the gun for protection in the neighborhood where the shooting took place, he still had possession of the weapon prior to the shooting, while he was waiting for a bus to return home. Defendant further admitted that, although the victim hit him on the left side of his face by his eye with enough force to make defendant stumble back, a photograph taken of him immediately after the shooting revealed no

bleeding, bruises, or scratches on defendant's face. Defendant did not seek medical attention when the police arrested him.

¶ 25    Defendant also stated that, after the victim grabbed defendant's right wrist (where defendant was holding the gun) and left shoulder, defendant had the gun "on [the victim's] left side." Defendant said that he fired first into the victim's left side, and although he was no longer struggling with the victim after that first shot, the victim did not fall; instead, defendant stated that the victim stood during the entire time that defendant was shooting. Defendant further denied that, when he started shooting, the rest of the group ran. When the State countered, "So everybody just stayed there and watched you with a gun," defendant responded, "Yes, sir."

¶ 26    When defendant fled the scene after the shooting, defendant admitted that he did not stop while police were chasing him and yelling at him to stop until he was "cut off" by police. At that point, defendant conceded that he still refused to show police his hands and kept holding onto the gun until a police officer tackled him to the ground.

¶ 27    On redirect examination, defendant confirmed that he always kept the gun at his great aunt's house and never brought it back to his mother's house where he lived. Defendant stated that he brought it with him on his way back to his mother's house because he was walking through the area. Defendant also said that, normally, he would always take the bus back to his mother's house and no one ever gave him a ride back home. Defendant recalled that there was not a lot of traffic at that time.

¶ 28    Chicago police sergeant Anthony Nicpon testified on behalf of the defense. Sergeant Nicpon stated that, at around 2:30 p.m. on May 21, 2014, he was a police officer in the bicycle patrol unit, and he and his partner placed the then 19-year-old Moore under arrest for street performing without a permit. Sergeant Nicpon recalled that, when Moore was placed into a squad

car, Moore tried to kick out the windows and later said "CPD killer" to the officers. Sergeant Nicpon further recalled that Moore also told him that the next time the officers stopped Moore, "it's on." On cross-examination, Sergeant Nicpon testified that Moore did not actually kick out any windows or place his hands on Nicpon, nor did Nicpon draw his revolver. Nicpon said that Moore was charged with two misdemeanors, failure to have a permit and assault (based upon the threats), and Nicpon did not recall having to testify in court about these events.

¶ 29      Chicago police officer Robert Brown then testified that, at around 6:30 p.m. on March 26, 2012, he and his partner placed the victim under arrest for refusing to leave the "King Gyro" restaurant, making verbal threats to Brown, and using profanity. Brown recalled that the victim said, "I don't have to go anywhere. I'll beat your ass. I don't have to do anything you say." Brown added that the victim "balled up his fist and looked at me in a menacing way like he was going to try to batter me." Brown recalled that the victim was a juvenile but did not recall his age. On cross-examination, Brown did not recall the victim taking "a swing" at him, hitting him, or fighting Brown when Brown was placing the victim in handcuffs. Brown testified that he did not have to draw his weapon, and he also could not remember being asked to testify as to these events.

¶ 30      Chicago police officer Ruhnke testified that, at around 7:03 p.m. on November 5, 2006, he and his partner were in the area of 132 East Marquette Street when they saw a large crowd of more than 10 people fighting with their bare fists and sticks. Ruhnke stated that the victim was a part of that group and was 12 years old at that time. Ruhnke stated that the group refused their order to disburse, so he placed the victim under arrest for "mob action, violence to person or property." On cross-examination, Ruhnke arrested six other people who were involved in the street fight. Ruhnke arrested the victim for a misdemeanor juvenile offense. Ruhnke called the victim's father, who picked the victim up from the police station and took the victim home. Ruhnke never recalled

the victim hitting him or any other officer involved in the arrest. When asked whether he recalled the victim "specifically being violent or hitting anybody else on the scene that date [*sic*]," Ruhnke responded, "No one on the scene was violent towards us at all."

¶ 31    Chicago police detective Keith Allen then testified that, at the initial interview with Moore following the shooting, Moore did not state that an individual approached him and the victim while they were walking and point a gun at both his and the victim's heads. Detective Allen, however, stated that Moore informed them of that fact during a "secondary follow-up interview the same day, [which was] more of a detailed interview." The defense then rested.

¶ 32    Following closing arguments, the jury began deliberations. The jury subsequently found defendant guilty of first-degree murder and further found that, during the commission of the offense, defendant personally discharged a firearm that proximately caused the victim's death.

¶ 33    During defendant's sentencing hearing, defense counsel noted defendant's upbringing in mitigation, including defendant's seizures that he had suffered from between the ages of 4 and 12. Defense counsel also argued that, although defendant was 18 years old at the time of this offense, the trial court should consider the mitigating factors noted in *Miller v. Alabama*, 567 U.S. 460 (2012) because defendant was "a young man whose brain was still developing, and his youth should be considered a factor in sentencing." Defense counsel asked for a minimum sentence.

¶ 34    The State produced no evidence in aggravation but referred the circuit court to defendant's presentencing investigation report (PSI). The State then argued that those cases in which the *Miller* factors were extended to defendants over the age of 18 "hing[ed] on accountable defendants," whereas here, defendant "took a gun and shot a young man out on the street multiple times. He is the shooter in this case." The State further observed that the sentencing enhancements were mandatory in this case and asked the court to impose an "appropriate" sentence.

¶ 35   Following arguments in aggravation and mitigation, the circuit court stated as follows:

"THE COURT:  To Andre Hunter's family, again, there is nothing—there is no closure of this.  There is always going to be that loneliness and no sentence whatsoever will ever bring Andre back.  These are things that I—I just see these senseless killings all the time.  It's just a shame.  It's just a shame.  You can see the loss of Andre's family here today.

Our Supreme Court of the United States has come down with a pronouncement about youthful offenders, and they said that when sentencing somebody, especially if they're under the age of 18, the most important factor is you, and *** the Illinois courts of review *** have interpreted this also to make sure that certain sentences aren't in effect, a natural life sentence.

So evaluating the circumstances here, taking into consideration that youth is a very important factor in sentencing and looking at the chances for rehabilitation, I find that I will sentence Mr. Frison to 22½ years on the first degree murder [conviction].  ***

The jury found that during the commission of the first degree murder, that Mr. Frison fired a weapon that proximately caused death to Andre Hunter.  I will sentence—the minimum sentence on that is 25 years, and that has to be served consecutive[ly]."

¶ 36   This appeal followed.

¶ 37                                                    ANALYSIS

¶ 38    Defendant first contends that his trial counsel was ineffective for failing to disclose *Lynch* evidence that would have supported defendant's claim of self-defense.  He argues that evidence that he had previously seen Moore with a gun "would have been the best evidence to bolster his claim that he was afraid [the victim], Moore, and the others with them in the crowd were going to hurt him."  He asks that we reverse his conviction and remand for a new trial.

¶ 39    Claims of ineffective assistance of counsel are governed by the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by the supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984).  *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010).  To establish ineffective assistance, a petitioner must show both that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the petitioner.  *Id.*  Deficient performance is performance that is objectively unreasonable under prevailing professional norms, and prejudice is found where there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Petrenko*, 237 Ill. 2d at 496-97; *Strickland*, 466 U.S. at 690, 694.  The failure to establish either prong of the *Strickland* test is fatal to the claim.  *People v. Clendenin*, 238 Ill. 2d 302, 317-18 (2010) (citing *Strickland*, 466 U.S. at 697).

¶ 40    Notably, "[c]ounsel's failure to present irrelevant evidence is not incompetence." *People v. Rush*, 294 Ill. App. 3d 334, 342 (1998).  In addition, matters of trial strategy are generally immune from claims of ineffective assistance of counsel except where the trial strategy results in no meaningful adversarial testing.  *People v. West*, 187 Ill. 2d 418, 432-33 (1999).  In essence, effective assistance of counsel simply refers to "competent, not perfect," representation.  *People v. Stewart*, 104 Ill. 2d 463, 491-92 (1984).  Thus, mistakes in trial strategy, tactics, or judgment will not "of themselves" render a trial counsel's representation constitutionally defective.  *Id.*  For

these reasons, we are highly deferential to trial counsel as to trial strategy, and we must evaluate her performance from her perspective at the time and not "through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007) (citing *People v. Madej*, 177 Ill. 2d 116, 157 (1997)).

¶ 41    In *Lynch*, our supreme court held that, when a defendant raises the defense of self-defense, the victim's violent and aggressive character is relevant to show who was the aggressor, which defendant may show by appropriate evidence. *Lynch*, 104 Ill. 2d at 200. Evidence of a victim's violent character may be offered to either: (1) demonstrate that the defendant's knowledge of the victim's violent tendencies affected his perceptions of and reactions to the victim's behavior; or (2) "support the defendant's version of the facts where there are conflicting accounts of what happened," even if the defendant had no prior knowledge of the victim's violent acts. *Id.* at 199- 200. Although evidence of a victim's violent character is admissible when a defendant presents evidence that he acted in self-defense, proof of the victim's prior nonviolent crimes would not tend to prove or disprove their violent character or reputation. *Id.*

¶ 42    In this case, trial counsel did not render ineffective assistance. At the outset, we question whether trial counsel's failure to disclose this evidence was objectively unreasonable. The evidence at issue consisted of the mere allegation that defendant had seen Moore (and not the victim) in possession of a weapon at some point in the past. Exercising one's constitutional right to possess a firearm neither constitutes a crime of violence nor establishes *per se* an individual's violent or aggressive character. See *People v. Aguilar*, 2013 IL 112116, ¶¶ 21-22 (citing *Moore v. Madigan,* 702 F.3d 933 (7th Cir. 2012)). As noted above, counsel is not ineffective for failing to present irrelevant evidence. *Rush*, 294 Ill. App. 3d at 342.

¶ 43    In addition, the jury also heard evidence of both Moore's and the victim's prior arrests and their violent behavior toward the police. In particular, the jury was well aware that the victim had

been arrested twice: once for mob action and another time when he refused to leave a restaurant and threatened a police officer by saying "I don't have to go anywhere. I'll beat your ass. I don't have to do anything you say," and by "ball[ing] up his fist" and looking menacingly at the officer. The jury also heard that Moore had been arrested and charged with assault based upon his acts of kicking at a police car window, shouting "CPD killer," and threatening the arresting officer that the next time the officer arrested Moore it would be "on." Ineffective assistance of counsel does not arise from a failure to present cumulative evidence. See *People v. Dupree*, 2018 IL 122307, ¶ 51. Since we must be highly deferential to trial counsel as to trial strategy and evaluate her performance from her perspective at the time and not "through the lens of hindsight" (*Perry*, 224 Ill. 2d at 344), we cannot hold that her failure to disclose this evidence pursuant to *Lynch* was objectively reasonable.

¶ 44 Nonetheless, we recognize that it is possible that Moore's previous possession of a weapon could indicate a violation of certain firearm laws, such as those requiring a firearm owner's identification (FOID) card or those prohibiting certain felons from possessing weapons. Setting aside whether (1) *Moore's* act could support defendant's claim of self-defense against *the victim* and (2) violation of these laws indicates a violent and aggressive tendency, there is nothing in the record to indicate that defendant knew that Moore's prior possession implicated these laws. Since defendant lacked this knowledge, it could not affect defendant's "perceptions of and reactions to [Moore's and the victim's] behavior" under the first *Lynch* scenario. *Lynch*, 104 Ill. 2d at 199-200. The second *Lynch* scenario, which arises when the evidence of an alleged violent character "support[s] the defendant's version of the facts where there are conflicting accounts of what happened" (*id.* at 199-200), is also inapplicable. Defendant freely admitted at trial that neither Moore nor the victim were armed, and this did not conflict with the State's evidence.

¶ 45    In any event, even assuming, *arguendo*, that defendant's claim met the first prong of the *Strickland* test, it did not meet the second.  The record in this case reveals that defendant, who admitted that he never saw the victim with a gun and that he was the only person armed with a firearm, shot five times into the victim, emptying the revolver.  Notably, Dr. Helenowski testified that one of the five gunshots entered the back of the victim and exited the front of his body.  The unmistakable inference from this evidence is that defendant shot the victim in the back and then four additional times, which is well after any possible threat would have dissipated.  On these facts, there is no reasonable probability that the jury's verdict would have been different, even if evidence of *Moore's* possession of a firearm at some point in history been presented to them.  Thus, defendant cannot meet both prongs of the *Strickland* test, so his claim necessarily fails.  See *Clendenin*, 238 Ill. 2d at 317-18 (2010) (citing *Strickland*, 466 U.S. at 697).

¶ 46    Finally, we reject defendant's reliance upon *People v. King*, 316 Ill. App. 3d 901 (2000), *People v. O'Banner*, 215 Ill. App. 3d 778 (1991), and *People v. Skinner*, 220 Ill. App. 3d 479 (1991).  In *King*, an attorney performed deficiently because he failed to call the only witness who could have corroborated the defendant's alibi defense.  *King*, 316 Ill. App. 3d at 916.  In *O'Banner*, this court concluded that trial counsel was ineffective for failing to (1) call defendant and her son to testify that her son fired the shot that killed the victim; (2) introduce the 9-1-1 call placed by defendant, which would have corroborated her proffered testimony and contradicted that of a police officer; and (3) introduce the evidence of the prior restraining order against the victim, which would have supported a claim of self-defense.  *O'Banner*, 215 Ill. App. 3d at 791-92.  In *Skinner*, we held that trial counsel's failure to both (1) call the defendant's mother and stepfather to corroborate defendant's trial testimony that he did not live in a residence where stolen goods were found and (2) cross-examine a third witness regarding that witness's post-theft silence

16

constituted ineffective assistance of counsel "which, when combined," met the second prong of the *Strickland* test. *Skinner*, 220 Ill. App. 3d at 484. Here, there is no similar combination of errors that would mandate relief, and defendant's self-defense claim was corroborated: the jury heard not only defendant's testimony but also evidence of Moore's and the victim's prior arrests and violent and aggressive behavior. *King*, *O'Banner*, and *Skinner* are thus unavailing.

¶ 47 Defendant next contends that his 47½-year sentence is an unconstitutional *de facto* life sentence. Defendant argues that the circuit court, other than acknowledging the importance of youth as a "very important" factor in sentencing, failed to give "any adequate consideration to the attributes of youth that apply equally" to both 18-year-olds and juveniles. Defendant concludes that his sentence violates both the eighth amendment to the United States Constitution and the proportionate penalties clause of the Illinois constitution as applied to him. He asks that we remand this cause for resentencing without the mandatory firearm enhancements.

¶ 48 Defendant first contends that *Miller*, which held that the Eighth Amendment prohibited mandatory life sentences for offenders under the age of 18, should nonetheless extend to young adult offenders such as himself. Defendant argues that the circuit court should not have imposed a 47½-year "*de facto* life sentence" on him without considering his use of marijuana, which began at the age of 12 and consisted of him smoking as many as 10 "blunts" of marijuana each day. Defendant stated that his "considerable marijuana habit undoubtedly affected his judgment" and his ability to understand the consequences of his confrontation with Moore and the victim. Defendant further noted that his PSI indicated a close relationship between him and his family, his attainment of his high school diploma, and attendance at a local community college.

¶ 49 Defendant's claim is unavailing. *Miller* explicitly held that the Eighth Amendment only prohibits "mandatory life without parole *for those under the age of 18*" at the time of their crimes.

(Emphasis added.) *Miller*, 567 U.S. at 465. Our supreme court later observed that, when the United States Supreme Court held that 18 would be the age to differentiate between juvenile and adult offenders, it was not "based primarily on scientific research" and merely coincided with the point where society determines adulthood and childhood for many other purposes. *People v. Harris*, 2018 IL 121932, ¶ 60 (citing *Roper v. Simmons*, 543 U.S. 551, 574 (2005)). The *Harris* court further noted that new research findings still did not alter that "traditional line." *Id.* The court then expressed agreement with those courts that had repeatedly rejected this claim and held that the age of 18 still marked the line between juveniles and adults for sentencing purposes. *Id.* ¶ 61. Defendant would clearly wish to change where that line is drawn but doing so is best left to the legislature. See generally, *People v. Buffer*, 2019 IL 122327, ¶¶ 34-35.

¶ 50    Defendant next contends that his sentence violates the proportionate penalties clause of the Illinois constitution as applied to him. This clause provides in relevant part that "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A sentence violates the proportionate penalties clause if it is "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005) (citing *People v. Moss,* 206 Ill. 2d 503, 522 (2003)). We may determine whether a sentence shocks the moral sense of the community by considering both objective evidence and "the community's changing standard of moral decency." *People v. Hernandez*, 382 Ill. App. 3d 726, 727 (2008).

¶ 51    In this case, defendant provides little analysis or support for his contention. He merely states that he was 18 years old at the time of the shooting and then makes the conclusory assertion that a 47½-year sentence does not provide him with "any meaningful opportunity at rehabilitation." He further cites *People v. Gipson*, 2015 IL App (1st) 122451 as support. *Gipson*, however, is

factually distinct from defendant's case in that the juvenile defendant there was convicted of attempted murder and had a documented history of mental health issues that "were not appropriately addressed." *Id.* ¶ 74. The defendant in *Gipson* was also sentenced under a sentencing scheme that prevented the circuit court from considering the defendant's youth and mental disorders. *Id.* ¶ 75.

¶ 52 Here, by contrast, although defendant was an adult and not a juvenile, the circuit court nevertheless did take defendant's youth into account when imposing the sentence. Moreover, defendant in this case was convicted of first-degree murder, not attempted murder. He had no documented mental health issues, unlike the defendant in *Gipson*. Finally, the circumstances of this crime were quite severe: the defendant emptied five rounds into the unarmed victim—one of which entered the victim's back—because the victim did not live in that neighborhood. On these facts, defendant's 47½-year sentence is not "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *Sharpe*, 216 Ill. 2d at 487. Defendant's claim is therefore meritless.

¶ 53                                CONCLUSION

¶ 54 Defendant's trial counsel did not render ineffective assistance for allegedly failing to to disclose *Lynch* evidence before trial. In addition, petitioner's 47½-year aggregate sentence is not an unconstitutional *de facto* life sentence. We therefore affirm the judgment of the circuit court.

¶ 55 Affirmed.