2023 IL App (1st) 220424
No. 1-22-0424
Order filed December 29, 2023

Sixth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 13 CR 7738 |
| v. | ) ) | |
| | ) | Honorable |
| ANTHONY JACKSON, | ) ) | Ursula Walowski, Judge Presiding. |
| Defendant-Appellant. | ) ) | |

_____

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Johnson and Justice C.A. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: Trial counsel failed to request a second-degree murder instruction; refused to allow defendant to testify, and argued self-defense to the jury without offering any supporting evidence. The cumulative effect of trial errors resulted in ineffective assistance of counsel and deprived defendant of a fair trial.

¶ 2    In 2015, Anthony Jackson was convicted by a jury of the murder of Sanchez Mixon. His brother, George Jackson III, a private attorney, represented him, and another private attorney later suspended from the practice of law. After the trial court granted Jackson's third posttrial motion for a new trial, Jackson's brother continued to represent him. On retrial, a jury convicted Jackson of first-degree murder. Subsequently, George Jackson was suspended from the practice of law.

¶ 3    Jackson argues ineffective assistance of trial counsel for failing to request a jury instruction on second-degree murder, refusing to allow defendant to testify, and not presenting *Lynch* evidence. See *People v. Lynch,* 104 Ill. 2d 194, 200 (1984) ("[W]hen the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may show it by appropriate evidence, regardless of when he learned of it.").

¶ 4    We reverse and remand for a new trial. The cumulative effect of defense counsel's actions deprived Jackson of a fair trial. Defense counsel chose an "all-or-nothing" theory and did not request a jury instruction on second-degree murder as an alternative verdict. The record reflects Jackson's purported waiver of his right to testify was prompted by George Jackson's threat to withdraw in mid-trial and, therefore, invalid. Regarding *Lynch* evidence, defense counsel argued self-defense but presented no evidence at trial to support a self-defense theory. The trial exhibits and the one eyewitness's testimony do not necessarily negate the possibility that the victim was the aggressor, and the defense decision to not produce evidence of the victim's aggressive nature, propensity for violence, or state of mind on the morning of the murder constituted ineffective assistance of counsel.

¶ 5                                    Background

¶ 6    In 2015, after a jury trial before Judge Stanley J. Sacks, Jackson was found guilty of first-degree murder. Jackson filed three motions for a new trial. See *People v. Jackson*, 2019 IL App (1st) 171582-U. After the first two motions were denied, the trial judge granted the third, based on co-counsel's ineffective assistance. *Id.* ¶ 2. A private attorney represented Jackson with George Jackson III, Jackson's brother, as second chair. The jury returned a guilty verdict. Shortly after, in April 2016, the private attorney was suspended from the practice of law.

¶ 7    George Jackson continued to represent Jackson. In a substitution of judge for cause motion filed on May 10, 2017, denied by Judge Porter, and a motion for reconsideration filed on May 15, George Jackson made numerous accusations against Judge Linn, among them "run[ing] amuck as a judge," being "broken," "dishonest," and engaged in "miscreant behavior." Judge Porter found him in direct criminal contempt based on statements maligning Judge Linn's character and intelligence. The case returned to Judge Linn, and on the same day, Judge Linn disqualified George Jackson from representing Anthony Jackson. After an interlocutory appeal, arguing the trial court abused its discretion in removing his counsel of choice, this court reversed, reinstating George Jackson as attorney of record. *Id.* ¶ 24. Jackson's case was set for retrial before Judge Walowski.

¶ 8    Sometime before the second trial began, the Cook County State's Attorney 's petitioned for and obtained an order of protection prohibiting George Jackson from entering the George N. Leighton Criminal courthouse. This order was later modified to allow George Jackson to enter the courthouse for business purposes if Cook County Sheriff's deputies accompanied him.

¶ 9    In early May 2021, Jackson moved for a change of venue, then filed an amended motion and a second amended motion, which Judge Walowski denied. A few weeks later, Judge Walowski entered two orders holding George Jackson in direct criminal contempt of court for inflammatory language both in the motions for a change of venue and in open court. George Jackson continued to represent Jackson. On several occasions in the next several months, George Jackson was late to court or failed to appear.

¶ 10    George Jackson was held in direct criminal contempt by four different judges. Both pretrial and in the course of this jury trial, George Jackson filed written motions and made oral motions in court, characterized by Judge Walowski as "conclusory," "inflammatory," and "contemptuous,"

which were denied. The inflammatory content of the motions, as well as comments made by George Jackson at the motion hearings, resulted in another order of contempt of court.

¶ 11                                 Pretrial Proceedings

¶ 12    On March 6, 2020, the State moved *in limine* to preclude the defense from introducing *Lynch* material not properly presented and argued in a pre-trial motion, and should no pre-trial *Lynch* motion be filed, the State requested that the court question George Jackson on his understanding and agreement with that decision. In addition, the motion sought to bar George Jackson from mentioning *Lynch*-related evidence, as the State would not be presenting evidence that Mixon was the initial aggressor. Further, as an affirmative defense, the issue of self-defense, if not raised by the State, requires the defendant to present some evidence on each element of the defense. The trial court granted the State's motion.

¶ 13                               Waiver of Right to Testify

¶ 14    Before trial, the trial judge had this exchange on Jackson's decision not to testify (slightly edited for clarity):

> THE COURT: Mr. Andrew Jackson, this is a decision you will make tomorrow, but you understand that testifying at your own trial is your own decision. You make that decision, okay. And I will go over that with you again tomorrow whether or not you decide to testify or not to testify, but that is your decision and your decision alone. So tomorrow I will go through that with you as well, okay.
>
> MR. ANTHONY JACKSON: Understood.

¶ 15    The discussion continued the next day (edited for clarity):

> THE COURT: We are outside the presence of the jury. Okay, Mr. Anthony Jackson, I just want to go over with you just to clarify your decision not to testify. So you understand that your attorney has rested the case, correct?
>
> MR. ANTHONY JACKSON: Yes.

THE COURT: And I'm sure your attorney discussed with you, but I want to assure myself that you understand. You have the right to testify or not to testify in your case. Do you understand that?

MR. ANTHONY JACKSON: Yes.

THE COURT: It is a decision that belongs to you and that you make. Clearly, you have the right to discuss testifying with your attorney, however, it is up to you to decide whether to testify, all right. Okay. So it is up to you. It's your decision whether to testify. Do you understand that?

MR. ANTHONY JACKSON: Yes.

THE COURT: Have you discussed this with your attorney?

MR. ANTHONY JACKSON: Yes.

THE COURT: And after speaking with your attorney, is it your decision not to testify?

MR. ANTHONY JACKSON: Yes.

THE COURT: All right. And are you making this decision freely and voluntarily? Nobody is forcing you to make this decision, correct?

MR. ANTHONY JACKSON: No one is forcing me.

THE COURT: Okay. So did you make that decision on your own, is what I'm asking you?

MR. ANTHONY JACKSON: Yes.

THE COURT: Okay. Anyone threaten you, force you, promise you anything, direct you against testifying?

MR. ANTHONY JACKSON: No.

THE COURT: And you understand that this is your decision alone whether to testify?

MR. ANTHONY JACKSON: Yes.

THE COURT: And you're choosing not to testify, is that correct?

MR. ANTHONY JACKSON: Yes.

THE COURT: All right. The Court finds the defendant knowingly and voluntarily has given up his right to testify.

MR. GEORGE JACKSON: Your Honor, I have an obligation to share—

THE COURT: Pardon me?

MR. GEORGE JACKSON: I said I have an obligation to share this with the court. Two things, one, I've instructed my client to stop challenging you and to answer your questions directly. But we did have a discussion, a very spirited discussion in back regarding whether he would testify. And I told him, look, if you testify, it won't be with me as your attorney. So whether that amounts to a threat—

THE COURT: No, no, no, no.

MR. GEORGE JACKSON: I don't know, Judge.

THE COURT: Mr. Jackson, that's improper. He has a right to testify. If your client chooses to testify, that you are his lawyer, okay. So I just went through the questions with Mr. Anthony Jackson. Mr. Anthony Jackson, do you understand, do you want to testify or do you not want to testify?

MR. ANTHONY JACKSON: I do not want to testify.

THE COURT: You do not.

MR. ANTHONY JACKSON: Yes.

¶ 16                                    Trial Evidence

¶ 17    At Jackson's retrial, the evidence showed that in March 2013, at about 11:30 a.m., Sanchez Mixon and Jackson had a physical altercation on the northbound CTA platform at the 43rd St. station. Surveillance cameras captured video (without audio) showing Jackson and Mixon on the platform, Jackson punching Mixon, and Mixon on the ground with Jackson kicking him in the head. The video also shows people on the opposite (southbound) platform yelling at Jackson and Jackson answering them. At this point, Mixon lies on the platform, moving slightly, until Jackson

stomps Mixon's head. Jackson then "engages" with the passengers on the other platform, returns to look at Mixon, and runs down the stairs. Mixon died a short time later.

¶ 18                                    State's Witnesses

¶ 19    Retired Chicago police officer Francis Higgins testified that at the time of the murder, he worked as an investigator for CTA Security. He reviewed video the same day, pulled the segments showing what happened, and gave the footage to the Chicago Police Department.

¶ 20    Police investigators matched the assailant's face with photographs of Anthony Jackson. The video shows Jackson going through the turnstiles and the events on the platform. Chicago police detective Kevin Kilroy searched the police database and identified Jackson. Kilroy went to Jackson's mother's house on March 16, but Jackson was not there. He and his partner left word that they were looking for Jackson. Two days later, Jackson turned himself in at the police station.

¶ 21    Retired nurse Georgia Lindsey was on the southbound platform. She identified Jackson, holding a briefcase, on the northbound platform. She saw another man talking to him, looked away, and people on her platform began screaming, "Stop, stop, stop." She turned back and saw Jackson hitting the other man who fell. Jackson started kicking, walked away, and came back, stomping him before picking up his briefcase and leaving. Lindsey made two recorded calls to 911.

¶ 22    That night, police detectives showed Lindsey a photo array that included Jackson, but she could not identify him because, she said, the incident had traumatized and frightened her. The next day, Lindsey viewed an in-person lineup and, again, could not identify Jackson, stating she still felt traumatized.

¶ 23    Former Chicago police homicide detective Timothy Cerven interviewed Lindsey about the lineup and photo array. He testified that "Ms. Lindsey became upset when we spoke with her,

myself and the state's attorney, and she then related that she did see the individual who fought Mr.

Mixon on the date of March 16."

¶ 24    According to the Medical Examiner, the primary cause of death was "the multiple blunt

force trauma injuries to the head due to an assault."

¶ 25                                    Defense Witnesses

¶ 26    Before presenting the defense witnesses, George Jackson informed the trial judge and the

State that he would not present the testimony of an employee at the facility where Mixon had been

staying and this discussion ensued:

> THE COURT: Okay. So Mr. Anthony Jackson, you have spoken with your lawyer, Mr.
> George Jackson, regarding not calling this witness from the Community Care Center,
> which was proffered that this is where Mr. Sanchez Mixon, the deceased in the case,
> where he was residing at the time of his death. You're agreeing with your lawyer that, as
> a matter of trial strategy, I guess, you're agreeing with that, that your lawyer is not going
> to be calling that witness, correct?
>
> MR. ANTHONY JACKSON: My understanding is that when he showed up and said that
> he was homicidal and suicidal it won't be incorporated in this trial.
>
> THE COURT: Correct.
>
> MR. ANTHONY JACKSON: I agree with my attorney.
>
> THE COURT: And so no witness from the Community Care Center is going to be
> testifying regarding anything regarding Sanchez Mixon that you understand.
>
> MR. ANTHONY JACKSON: Because the Court won't let in he's homicidal and suicidal -
> -
>
> THE COURT: No, that's not why. That's not why.
>
> MR. ANTHONY JACKSON: I agree.
>
> THE COURT: Okay. Sorry.
>
> MR. ANTHONY JACKSON: I agree.

¶ 27    Eunita Taylor, Jackson's sister, testified she drove him to "L" station, dropped him off, parked, and checked her GPS. Ten minutes later, Jackson knocked on her van window and got inside. He was agitated and said, "I had to defend myself," and "he was crazy. He looked crazy. Something was wrong with him."

¶ 28    Shacara Ledbetter, a lip reader, testified she attempted to analyze the video but could not discern anything Jackson or Mixon said on the tapes.

¶ 29                              Jury Instructions Conference

¶ 30    In the middle of the trial, during conferences regarding matters including jury instructions, George Jackson was asked about lesser-included offense instruction and stated, "No. We're not doing less included, it's murder or nothing." Regarding the defense witnesses, the trial court and George Jackson had the following exchange:

> THE COURT: *** Mr. Jackson, yesterday we spoke of some witnesses that the parties agreed to have testify out of order. So Mr. Jackson, I'll now give you the floor as to what witnesses you have available and who, if anyone, you're agreeing to call before the State rests its case.
>
> MR. GEORGE JACKSON: There are two witnesses, Judge. We spoke yesterday about a third witness. That third witness was from the Community Care Center. And I've made a decision not to use the Community Care Center for fear of the fact that the history of Mr. Sanchez Mixon coming out. So we've elected not to use him. It is our decision.
>
> THE COURT: Okay. So and Mr. Anthony Jackson you have spoken with your lawyer about that witness and I think you're referring to some background of Mr. Mixon that you are choosing not to bring up in this case, is that right, Mr. Jackson?
>
> MR. GEORGE JACKSON: That's correct, Judge.
>
> THE COURT: And Mr. Anthony Jackson, you have discussed this with your lawyer and you agree with that strategy?
>
> MR. ANTHONY JACKSON: I need to talk to my attorney.

\*\*\*

THE COURT: So you can talk to him about that when we break. So let's move on. That is a witness that you could discuss with your client that you're telling me that you have chosen not to call.

¶ 31     After the defense rested, the trial court addressed Jackson (slightly edited for clarity):

THE COURT: Now, Mr. Anthony Jackson, as you're aware the State has charged you with first-degree murder. The lesser included offense of second-degree—the lesser included offense of first-degree murder. Your attorney has not asked for a second-degree murder instruction, do you understand that?

MR. ANTHONY JACKSON: Yes.

THE COURT: You have pled and your attorney has asked for and the State incorporated in the jury instructions self-defense, so that jury instruction regarding what the State needs to prove regarding self-defense is being given. However, the lesser included offense of second-degree murder is not being requested of me by your attorney. Do you understand that?

MR. ANTHONY JACKSON: Yes.

THE COURT: Now, it is your decision once again whether or not to submit the lesser offense of second-degree murder instruction to the jury. Do you understand that?

MR. ANTHONY JACKSON: Yes.

THE COURT: And have you discussed that with your lawyer?

MR. ANTHONY JACKSON: Yes.

THE COURT: Now, the offense of first-degree murder, as you know, carries a possible sentence from 20 to 60 years in the Illinois Department of Corrections with a period of three years of parole. Do you understand that?

MR. ANTHONY JACKSON: Now I do.

THE COURT: Okay. You could be found guilty of this offense, or you could be found not guilty. Do you understand that?

MR. ANTHONY JACKSON: Yes.

THE COURT: So the murder charges are 20 to 60 years at a hundred percent time. Do you understand that?

MR. ANTHONY JACKSON: Yes.

THE COURT: The second-degree murder charges are Class 1 felonies, the sentencing range is 4 to 20 years in the Illinois Department of Corrections, and that is 50 percent time case, it's not a hundred percent time case. Do you understand that?

MR. ANTHONY JACKSON: Yes.

THE COURT: [S]o if you ask for the second-degree murder instruction, a jury could find that you had not committed murder, but that you were guilty of second-degree murder, so you could be found not guilty first-degree murder, but guilty of second-degree murder if that instruction is—would be asked for and is given. Do you understand that?

MR. ANTHONY JACKSON: Yes.

THE COURT: And you do not want or even discussed this with your lawyer, correct?

MR. ANTHONY JACKSON: Yes.

THE COURT: And do you want me to instruct on second-degree murder?

MR. ANTHONY JACKSON: No.

\*\*\*

THE COURT: Have you been threatened, forced, promised in any way not to submit the second-degree instruction?

MR. ANTHONY JACKSON: No.

THE COURT: I find that the defendant knows that it is his decision whether to submit the lesser offense instruction of second-degree murder, that he is not requesting it, that Mr. George Jackson, his lawyer, has not requested it, and he is doing so freely and voluntarily, and I will accept that decision and find that it is reasonable in this case. So, I will not give the second-degree jury instruction.

¶ 32     After deliberating about one-and-a-half hours, the jury returned a guilty verdict. The trial court granted George Jackson leave to withdraw and appointed the public defender's office to represent Jackson posttrial. Jackson was sentenced to 25 years' imprisonment.

¶ 33                              Analysis

¶ 34     Jackson argues trial counsel was ineffective because of his errors "which had the cumulative effect of depriving [Jackson] of the opportunity to have his case decided by a jury that had been presented with a full, viable defense." Jackson argues that if the jury heard the available *Lynch* evidence and Jackson's testimony and had been instructed as to self-defense, the jury would more likely have found him guilty of second degree murder. The State responds that Jackson waived his right to testify and asserts his jury instruction argument. Moreover, the State asserts Jackson suffered no prejudice.

¶ 35     The sixth amendment to the United States Constitution guarantees assistance of counsel to all criminal defendants. U.S. Const. amend VI. The Illinois Constitution provides the same right. Ill. Const., art I, section 8. Under *Strickland v. Washington*, a successful ineffective assistance of counsel claim must establish counsel's conduct fell below an objective standard of reasonableness, and prejudice resulted from counsel's conduct; that is, "but for" counsel's deficient performance, there exists a reasonable probability the outcome of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-94. A reasonable probability means "counsel's deficient performance rendered the result of [the proceedings] unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004). See *People v. Patterson,* 192 Ill. 2d 93, 122 (2000) ("reasonable probability" must undermine confidence in outcome).

¶ 36                     Self Defense and Jury Instructions

¶ 37    Jackson first argues that his attorney "performed deficiently when he failed to request second degree murder instructions," which constitutes prejudice. The State responds that under *People v Wilmington*, 2013 IL 112938, ¶ 48, no right to submit a second degree murder instruction exists because, rather than a lesser-included offense of murder, second degree murder involves a "lesser mitigated offense." According to the State, Jackson knowingly and intelligently waived the right to second degree murder instructions and suffered no prejudice

¶ 38    For a second degree murder conviction based on imperfect self-defense, a defendant must show by a preponderance of evidence that at the time of the murder, he or she believed the circumstances to justify the use of force, but this belief was unreasonable. 720 ILCS 5/9-2(a)(2) (West 2013). See *People v. Jeffries*, 164 Ill. 2d 104, 113 (1995) ("The imperfect self-defense form of second degree murder occurs when there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable."). In his reply brief, Jackson cites *People v. Thornton*, 26 Ill. 2d 218, 222 (1962) (right of self-defense does not permit "pursuit and killing of even an original aggressor after the aggressor abandons the quarrel") for the proposition that his counsel was ineffective when he argued self-defense under these circumstances.

¶ 39    Jackson also relies on *People v. King*, 316 Ill. App. 3d 901, 915-16 (2000), where counsel was ineffective for failing to call a witness to "bolster[] an otherwise uncorroborated defense"; *People v. O'Banner*, 215 Ill. App. 3d 778, 790 (1991), explaining that when a defendant raises the issue of self-defense, they can introduce violent acts by the alleged victim to show that the victim had been the aggressor, even if the defendant was unaware of the acts.

¶ 40    An employee from the Community Care Center where Mixon lived was a potential *Lynch* witness. Initially, George Jackson intended to present testimony that Mixon had been agitated and aggressive on the morning of the incident. Yet George Jackson decided not to call this witness and stated on the record that he "made a decision not to use the Community Care Center for fear of the fact that the history of Mr. Sanchez Mixon coming out." This decision does not seem reasonable under the circumstances.

¶ 41    George Jackson's repeated insistence during trial that the jury would hear only one theory was prejudicial. That the "all-or-nothing" strategy proved unsuccessful does not necessarily mean counsel performed unreasonably and rendered ineffective assistance. *People v. Walton*, 378 Ill. App. 3d 580, 589 (2007) ("Counsel's decision to advance an "all-or-nothing defense" has been recognized as a valid trial strategy (citations omitted) and is generally not unreasonable unless that strategy is based upon counsel's misapprehension of the law.").

¶ 42    But George Jackson argued Jackson was acting in self-defense, using the video recording showing an exchange of words and body language even without audio, and Jackson's sister's testimony about how Jackson described Mixon's actions. The defense in oral argument asserted that George Jackson said Jackson believed he was in danger but did not produce evidence to support this argument. The decision to forego calling the Community Care employee as a witness contributed to the lack of evidence on this point.

¶ 43    Had the trier of fact been presented with the option of finding the defendant's conduct reckless, a reasonable probability existed for a different result. *People v. Lemke*, 349 Ill. App. 3d 391 (2004), presents prejudice resulting from trial counsel's ineffective assistance of counsel and supports Jackson's argument on this point. The *Lemke* court reversed the defendant's murder

conviction and ordered a new trial because trial counsel used an "all-or-nothing approach," arguing the shooting was an accident. *Id*. at 402. But, the court found the reckless act of pointing a gun at the victim could not be considered an accident, even viewing the evidence in the light most favorable to the defendant. *Id.*

¶ 44    In his brief, Jackson asserts that George Jackson's decision to pursue an all-or-nothing claim of self-defense was objectively unreasonable, arguing:

> "Viewing the video, it is clear that [Jackson]'s actions exceeded the bounds of pure self-defense. Particularly, [his] act of re-approaching Mixon, who was on the ground incapacitated and seemingly unconscious, almost a full minute after the altercation concluded, and kicking and stomping him in the head, invalidates the claim that the amount of force [Jackson] used was necessary to defend himself. Indeed, the right to self-defense does not allow the pursuit and killing of even an original aggressor after the aggressor abandons the quarrel. [cases omitted]. * * *Put simply, no reasonable attorney would view this video and take the extreme, unreasonable risk of an all-or-nothing strategy in these circumstances."

¶ 45    We agree that the jury would have had the guidance of the instruction and not been limited to the "all-or-nothing" conclusion of conviction for murder or acquittal. Jackson's actions in the video virtually invalidated the possibility of a pure acquittal based on self-defense, and, therefore, second degree murder instructions were vital.

¶ 46                            Waiver of Right to Testify

¶ 47    Bolstering the argument that pursuing an "all or nothing" trial strategy was objectively unreasonable, Jackson asserts that his waiver of his right to testify made this strategy more

unreasonable. Again, in *Lynch*, although the defendant did not know of the victim's three convictions for battery at the time he shot him, evidence of the victim's propensity for violence tended to support the defendant's version of facts and was admissible. *Lynch*, 104 Ill. 2d at 199-210. Under *Lynch*, Jackson's testimony presumably would have apprised the jury of his own state of mind as he encountered Mixon on the CTA platform.

¶ 48     Jackson claims that he could not present his state of mind because he did not testify. Jackson's sister testified that she had dropped Jackson off at the CTA station, and, minutes later, he returned to her car agitated, telling her, "I had to defend myself," and saying that Mixon "was crazy. He looked crazy. Something was wrong with him." The eyewitness on the opposite elevated platform testified Jackson and Mixon had words that she could not hear. The jury viewed video and still photographs.

¶ 49     The State concedes trial counsel's comment that he would withdraw if Jackson testified was "inappropriate" but argues Jackson properly waived his right. The State cites *People v. Knapp*, 2020 IL 124992, ¶ 54 and *People v. Palmer,* 2017 IL App(4th) 150020, ¶¶ 22-23, involving postconviction claims of exchanges between the defendants and defense counsel influencing their decision to waive their rights. Jackson distinguishes these cases, and we agree the circumstances differ. Even though George Jackson's inappropriate interjection occurred in the middle of the judge's admonishments to Jackson and was followed immediately by Jackson's waiving his right to testify, the admonishment does not cure the prejudicial effect of pressure from Jackson's attorney, his older brother, whose familial relationship adds an emotionally nuanced element influencing the representation in unique ways.

¶ 50    In closing argument, George Jackson reviewed the entire video, pausing and narrating the events as the video played. The movements of the two men and their proximity to each other were emphasized and argued as a provocation by Mixon to justify Jackson's acting in self-defense. Although attempting to bring attention to Mixon's movements before and during the physical confrontation, the repeated emphasis on the video without the testimony about Mixon's earlier aggression that morning or the benefit of a second degree murder instruction can only have prejudiced Jackson in front of the jury. Based on the evidence at trial, in particular, the video showing Jackson attacking Mixon without provocation and returning to beat him well after having become incapacitated

¶ 51    But counsel did not call witnesses who could have testified about Mixon's behavior that morning, nor were witnesses presented to testify about the events on the platform—the words exchanged or the physical bumping or touching. (One prosecution witness, Lindsey, testified about the little she was able to hear and see part of the altercation.) Regarding the witness from Mixon's residential facility, the State accurately cites to the record for the trial court's ruling that the witness's testimony was irrelevant. Still, the summary does not reflect the method George Jackson used to proffer the witness minutes before closing arguments.

¶ 52    Finally, we take judicial notice that George Jackson's license to practice law has been suspended "for three years and until further order of the court, effective September 8, 2023. [Case Research Document (iardc.org)](). The suspension resulted from George Jackson's actions representing Anthony Jackson in this matter.

¶ 53    Because effective assistance refers to competent, not perfect representation, trial strategy mistakes or judgments will not, by themselves, render the representation incompetent. *People v.*

*Calhoun*, 404 Ill.App.3d 362, 383 (2010). But George Jackson's behavior was not limited to trial errors; throughout the years of proceedings during which he represented his brother, George Jackson indulged in courtroom stunts that resulted in four judges holding him in contempt. Judge Porter found George Jackson in direct criminal contempt based on statements maligning Judge Linn's character and intelligence. Judge Walowski entered two orders holding George Jackson in direct criminal contempt of court for inflammatory language both in the motions for a change of venue and in open court. These findings of contempt, along with the others, demonstrate a pattern of behavior throughout the proceedings that began as soon as George Jackson returned to represent his brother. The record is replete with examples of rude and bullying behavior, directed primarily at the trial judge and prosecuting attorneys, but also hinted at in his interruptions on the record while the trial judge addressed the defendant, his younger brother. He distracted and delayed and interfered with Anthony Jackson's rights.

¶ 54    No number of admonitions could have cured the prejudicial effect on the jury. We find George Jackson's deficient performance prejudiced Jackson.

¶ 55    Reversed and remanded.