2022 IL App (1st) 211174-U

No. 1-21-1174

Order filed August 26, 2022

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 1778 |
| | ) | |
| IMAN FRISON, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Cunningham and Connors concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant's postconviction petition set forth an arguable claim of actual innocence based on affidavits of newly discovered occurrence witnesses. Accordingly, we reverse the circuit court's dismissal of his petition at the first stage, and remand for second-stage proceedings.

¶ 2   Defendant Iman Frison appeals from the summary dismissal of his petition for postconviction relief filed through counsel under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). On appeal, defendant contends that he raised an arguably

meritorious claim of actual innocence based on the affidavits of two newly discovered occurrence witnesses. Alternatively, defendant contends that his postconviction counsel was ineffective for advancing a proportionate penalties violation based on *Miller*, but failing to plead or develop facts specific to him. We reverse and remand for second-stage proceedings.

¶ 3    Following a jury trial in 2017, defendant was convicted of first degree murder in the shooting death of Andre Hunter and sentenced to 47½ years' imprisonment. We affirmed. See *People v. Frison*, 2020 IL App (1st) 171486-U. The following background, derived from our order on direct appeal, is limited to those facts relevant to this appeal.

¶ 4    Before trial, defendant filed a motion to admit evidence of prior, unrelated incidents involving Hunter and another individual, Jordan Moore. Defendant argued that under *People v. Lynch*, 104 Ill. 2d 194 (1984), the incidents supported his claim of self-defense by showing Hunter's and Moore's propensity for violence. The circuit court granted the motion.

¶ 5    At trial, Moore testified that around 2:30 p.m. on December 19, 2013, he and Hunter walked to a convenience store near West 79th Street and South Vincennes in Chicago. Inside, an individual known as "Tank" shook their hands and said, "What's up." Moore and Hunter had no other interaction with Tank. After making purchases, they walked north on South Stewart Avenue toward West 75th Street.

¶ 6    At West 77th Street, Moore and Hunter heard defendant call, "Yo, yo, yo." Moore and Hunter stopped because they thought defendant was someone they knew. As defendant approached, Moore and Hunter realized they did not know him. Moore saw a firearm in the waistband of defendant's pants.

¶ 7 Defendant drew the firearm and asked Moore and Hunter if they were from "5th Wuga world," meaning the area of 75th and Stewart. Moore answered no, and explained that they had grown up near 79th and Stewart. Defendant pointed the firearm at Hunter's chest, who pushed it away. At that moment, Tank approached and said, "Don't let him touch that gun, pop his *** a***."

¶ 8 Moore and Hunter fled, but Hunter slipped and fell. Hunter extended his hand to defendant, who stood over him and to his right and shot Hunter three times. The firearm clicked twice, and then defendant fired two more shots before fleeing toward 79th. Neither Moore nor Hunter had weapons.

¶ 9 Moore called the police and spoke to officers at the scene. The next day, Moore identified defendant in a lineup at the police station. On cross-examination, Moore denied that Hunter "swatted" at defendant's firearm; instead, he only "lightly pushed the gun away."

¶ 10 Flynnard Turner, a bus operator, testified that on December 19, 2013, around 2:30 p.m., he was at the intersection of West 78th Street and Vincennes. Four to six individuals walked north along Stewart, then out of his line of sight. Approximately one minute later, he heard four to six gunshots from the direction of the group, and saw the same individuals running in the direction they had come. Turner flagged a police vehicle and told officers what he observed. Turner also saw someone with "dreads" fumble with the front of his jacket as he ran. He could not see the person's face, however, and did not identify anyone in a subsequent photographic lineup.

¶ 11    Chicago police officer Eric White testified that around 2:30 p.m. on December 19, 2013, he and his partner were driving south on Vincennes when a bus driver stopped them. White then saw defendant running southbound on Vincennes, holding something in his waistband. White and his partner pursued and tackled defendant. Afterwards, defendant stood and a large revolver fell from his waistband. Officers recovered the weapon and transported defendant to the police station.

¶ 12    Defendant testified that he was 18 years old on December 19, 2013. He had lived in the neighborhood of the shooting until 2000, when his family moved because the area had become "very violent." Defendant's great aunt still lived in the neighborhood, however, and defendant was at her home the night before the shooting. Defendant carried a firearm for protection because he was attacked about two months before Hunter's murder.

¶ 13    The day of the shooting, defendant visited a friend and smoked marijuana for a few hours. Defendant then waited for a bus to go home. While waiting, he saw Moore, whom he knew from grade school, with a group of seven to nine people. Defendant did not know Hunter or the others in the group. Defendant did not get along with Moore because defendant had dated Moore's sister, and Moore threatened to "beat [his] a***" unless he stopped seeing her. Moore wanted to talk, and defendant thought they would "smooth things out." Since defendant no longer dated Moore's sister, he was not afraid of Moore.

¶ 14    Moore asked defendant if he was still talking to Moore's sister, and defendant replied that he was not. Hunter said, "Why the *** you still talking to him?" Hunter approached and punched defendant, causing defendant to stumble back a few feet. Moore told Hunter to "beat [defendant's] a***." As Hunter approached, defendant drew his firearm from his

waist. Moore said, "don't let him get that gun." Others in the group surrounded defendant. Hunter grabbed defendant's left shoulder and right wrist, and defendant discharged his firearm because he feared for his life. He could not remember how many times he fired, but he kept shooting until the firearm stopped. Hunter was standing when defendant fired.

¶ 15    Defendant ran towards 79th Street for "safety to just get away." No one ran with him or behind him. Although he "crossed paths" with police officers, he did not request help because he "never got the time to even think about it," and kept running although officers chased him and instructed him to stop. After the officers stopped defendant, he refused to show his hands, and held the firearm until an officer tackled him.

¶ 16    Neither Hunter nor Moore had attacked the defendant before. Although defendant purchased the firearm for protection, he only kept the weapon at his great aunt's house. He denied that the group fled when he started shooting, that he intended to fire the weapon, or that he intended to harm Moore or Hunter. Defendant stated that Hunter hit the side of his face, but a photograph taken of defendant immediately after the shooting revealed no bleeding, bruises, or scratches, and he did not seek medical attention.

¶ 17    Chicago police detective Keith Allen testified that during his initial interview with Moore, he did not say an individual approached him and Hunter with a firearm pointed at their heads. Moore informed Allen of that fact in a second interview conducted on the same day.

¶ 18    Pursuant to the court's ruling on defendant's *Lynch* motion, the defense called Chicago police sergeant Anthony Nicpon and Chicago police officers Robert Brown and Ruhnke.[1]

---

[1] Officer Ruhnke's first name is not contained in the record.

¶ 19 Nicpon testified that on May 21, 2014, at approximately 2:30 p.m., he and his partner arrested Moore, then 19 years old, for street performing without a permit. As they placed Moore into their vehicle, he tried to kick out the windows and stated that the next time officers stopped him, "it's on." On cross-examination, Nicpon confirmed that Moore did not actually kick out any windows or touch the officers.

¶ 20 Brown testified that on March 26, 2012, he and his partner arrested Hunter for refusing to leave a restaurant, threatening Brown, and using profanity. Hunter said, "I don't have to go anywhere. I'll beat you're [*sic*] a\*\*\*. I don't have to do anything you say." Hunter "balled up his fist and looked at [Brown] in a menacing way like he was going to try to batter [him.]" Hunter was a juvenile, but Brown did not recall his age. On cross-examination, Brown did not recall if Hunter attempted to strike him, and Brown did not draw his weapon.

¶ 21 Ruhnke testified that around 7:03 p.m. on November 5, 2006, he and his partner observed more than 10 people near 132 East Marquette Street, fighting with fists and sticks. Ruhnke arrested Hunter, then age 12, and six others for "mob action [and] violence to person or property." On cross-examination, Ruhnke did not recall Hunter hitting him or another officer. When asked whether Hunter was "specifically being violent or hitting anybody else on the scene," Ruhnke responded, "No one on the scene was violent towards us at all."

¶ 22 The jury found defendant guilty of first degree murder, and also found that during the offense he personally discharged a firearm that proximately caused Hunter's death. The court sentenced defendant to a total of 47½ years' imprisonment.

¶ 23    On direct appeal, defendant argued that (1) trial counsel was ineffective for failing to disclose, under *Lynch*, evidence that defendant had previously seen Moore with a gun; and (2) his 47½-year prison term was an unconstitutional *de facto* life sentence. This court affirmed. *Frison*, 2020 IL App (1st) 171486-U, ¶ 54.

¶ 24    On June 30, 2021, defendant, through counsel, filed a postconviction petition alleging that (1) the attached affidavits of Kevin Muhammad and Peter Harris, combined with evidence showing Hunter's aggressive and violent character, supported a claim of actual innocence where defendant shot Hunter in self-defense; (2) trial counsel failed to investigate or introduce photographs that depicted Moore holding a handgun; and (3) defendant's *de facto* life sentence was unconstitutional because the sentencing court did not consider his youth or its attendant characteristics.

¶ 25    In his affidavit, dated March 5, 2019, Muhammad stated:

        "On December 19, 2013 Iman Frison acted in self-defence [*sic*]. I was in the area of 78th and Stewart standing on the corner. At that time a group of guys were jumping him and at that moment I saw someone out of the crowd reach for what appeared to be a weapon. As I looked closely I observed a black handgun, then shots were fired. I then ran for my own safety."

¶ 26    Harris stated in his affidavit, dated October 1, 2019, that:

        "During the day of December 19, 2013, at about 2:30 pm, I was outside on the front of my sister's house [at] 7601 S. Stewart, I saw what appeared to be, Iman Frison getting jumped by a group of six guys. About 30 seconds later as I was approaching the

corner of 77th and Stewart, 4 to 6 gunshots rang out from the group of individuals involved in the altercation. I ran back to my sister's house to get out [*sic*] the line of fire."

¶ 27    In his postconviction petition, defendant stated that he "was not aware of these witnesses prior to his trial." Defendant also provided his supplemental affidavit stating that he told trial counsel that Moore previously threatened his life, and that he provided counsel with photographs "supporting my knowledge that [Moore] owned and carried firearms."

¶ 28    On September 14, 2021, the circuit court dismissed defendant's petition as frivolous and patently without merit. The court stated that "actual innocence means 'total vindication.' " Since defendant's claim of self-defense did not "excuse him of the crime," it would not "even approach a claim of actual innocence." The court further found that defendant's sentencing claim was barred by *res judicata*, and that defendant's trial counsel performed satisfactorily.

¶ 29    On appeal, defendant contends that the circuit court erred in dismissing his petition where he presented an arguable claim of actual innocence based on the affidavits of newly discovered eyewitnesses. Alternatively, defendant argues that postconviction counsel was unreasonable for advancing a proportionate penalties violation based on *Miller* but failing to plead or develop facts specific to defendant, where defendant was a young adult at the time of the offense.

¶ 30    The Act "provides a statutory remedy to criminal defendants who assert claims for substantial violations of their constitutional rights at trial." *People v. Robinson*, 2020 IL 123849, ¶ 42. A postconviction petition is not an appeal from the conviction, but a collateral attack on the trial court proceedings. *People v. Tate*, 2012 IL 112214, ¶ 8. "Thus, issues raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised but were not are forfeited." *Id.*

¶ 31 The Act sets forth a three-stage process for adjudicating a postconviction petition. 725 ILCS 5/122-1 *et seq.* (West 2020). The circuit court here dismissed defendant's petition at the first stage, which is proper only if the petition is frivolous or patently without merit. *People v. Harris*, 224 Ill. 2d 115, 125-26 (2007). A petition is frivolous or patently without merit if it has "no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition based on indisputably meritless legal theories or fanciful factual allegations lacks an arguable basis in law or in fact. *Id.* At the first stage, we "take the allegations as true and construe them liberally." *People v. Allen*, 2015 IL 113135, ¶ 41. Although the threshold to advance to the second stage is low, the petition must present sufficient facts to show that the allegations are "capable of objective or independent corroboration." *People v. Collins*, 202 Ill. 2d 59, 67 (2002). We review the court's first stage dismissal of defendant's petition *de novo*. *Hodges*, 234 Ill. 2d at 9.

¶ 32 Defendant's postconviction petition alleged actual innocence based on the affidavits of Muhammad and Harris. To support a claim of actual innocence, evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *People v. Edwards*, 2012 IL 111711, ¶ 32. "The conclusive character of the new evidence is the most important element of an actual innocence claim." *Robinson*, 2020 IL 123849, ¶ 47.

¶ 33 Evidence is newly discovered if it was discovered after trial and could not have been discovered earlier through due diligence. *People v. Coleman*, 2013 IL 113307, ¶ 96. Here, the State argues that affidavits stating defendant was "jumped" are not new because defendant would

have known that fact prior to trial. This argument, however, "misapprehends the standard for 'newly discovered' evidence." *People v. Ortiz*, 235 Ill. 2d 319, 334 (2009).

¶ 34    In *Ortiz*, the defendant was convicted of first degree murder and filed a second successive postconviction petition. The defendant attached an affidavit from Sigfredo Hernandez, who stated that he saw three people other than the defendant beat and shoot the victim. *Id.* at 326. The State argued that Hernandez's evidence was not "newly discovered" because it substantially recounted the same events contained in an affidavit attached to the defendant's first successive petition. *Id.* at 333. In that affidavit, a different witness similarly stated that he saw two people beat and shoot the victim, but did not mention the defendant's name. *Id.* at 325.

¶ 35    The supreme court, however, found that Hernandez's affidavit qualified as newly discovered evidence where the defendant could not have discovered Hernandez earlier through due diligence. *Id.* at 334. The court noted that Hernandez only came forward 10 years after purportedly witnessing the incident, claimed to have observed the incident from a location where the defendant could not see him, and he made himself unavailable by moving out of state. *Id.*

¶ 36    More recently, in *People v. Jackson*, 2018 IL App (1st) 171773, this court addressed whether an affidavit was newly discovered where the defendant previously knew of the information contained therein. The court, citing *Ortiz*, emphasized that "a claim of actual innocence based on the testimony of an additional eyewitness previously unknown to the defendant constitutes a new 'claim' of actual innocence." *Id.* ¶ 75. If the defendant could not have discovered the witness sooner through due diligence, the newly discovered evidence can support a claim of actual innocence. *Id.* ¶ 76; see also *People v. Wilson*, 2022 IL App (1st)

192048, ¶ 71 (an affidavit from a witness whom the defendant could not have known at the time of the shooting was newly discovered evidence).

¶ 37    In their affidavits, Muhammad and Harris stated that they witnessed the incident at separate locations approximately one block from the scene. Neither witness stated that defendant saw him at the scene and no testimony at trial referenced Muhammad or Harris. In his petition, defendant asserted that he "was not aware of these witnesses prior to his trial." Furthermore, like the affiant in *Ortiz*, Muhammad and Harris did not come forward as witnesses prior to defendant's trial. Instead, they made themselves unavailable by immediately running from the scene. Nothing in the record or affidavits indicates that defendant or trial counsel knew of Muhammad and Harris.

¶ 38    At this stage of postconviction proceedings, we take as true all well-pleaded allegations in the petition and supporting affidavits not positively rebutted by the record. *Robinson*, 2020 IL 123849, ¶ 45. As such, we find that the affidavits are newly discovered evidence that defendant could not have discovered sooner through due diligence. See *People v. Anderson*, 2021 IL App (1st) 200040, ¶ 63 ("[i]f an unknown, unobserved and unrecorded witness chooses not to come forward, there is no amount of due diligence that can force him or her to come forward to get involved" (internal quotation marks omitted)).

¶ 39    To support an actual innocence claim, newly discovered evidence must also be material and not cumulative. *Edwards*, 2012 IL 111711, ¶ 32. "Evidence is material if it is relevant and probative of" a defendant's innocence. *Robinson*, 2020 IL 123849, ¶ 47. Noncumulative evidence adds to the evidence before the jury. *Coleman*, 2013 IL 113307, ¶ 96.

¶ 40 Evidence that supports a self-defense claim is relevant to, and probative of, a defendant's innocence. *People v. Woods*, 2020 IL App (1st) 163031, ¶ 41. In this case, however, the State contends that the affidavits are immaterial because they provide no information regarding the reasonableness of defendant's belief that the existing danger required him to discharge his firearm. The State argues that to be material, the affidavits must address whether Hunter, rather than defendant, was the aggressor, and whether Hunter was armed during the confrontation.

¶ 41 Although the affidavits do not refer to these specific concerns, they do address whether defendant had a reasonable belief in self-defense. Evidence that a group of people "jumped" defendant before shots were fired is relevant to his self-defense claim. See *People v. Williams*, 57 Ill. 2d 239, 243 (1974) (use of force was justified where the defendant was confronted by a hostile mob led by a person who intended to fight the defendant). Also, Muhammad stated that he saw someone in the group reach for a black handgun. At trial, no witness testified that another person at the scene had a weapon. This new information arguably shows that the group was prepared to fight defendant and, thus, is probative of whether defendant had a reasonable belief in the need to fire his weapon in light of that danger.

¶ 42 Furthermore, defendant's testimony and Moore's testimony conflicted on almost every point relating to defendant's self-defense claim. Defendant testified that he carried a firearm for protection. He knew Moore, but they did not get along because Moore had threatened defendant for dating Moore's sister. On the day of the shooting, Moore was with seven to nine people, including Hunter. Hunter punched defendant, who heard Moore tell Hunter to "beat [defendant's] a***." As Hunter approached, defendant drew his firearm. The group

surrounded defendant. Defendant asserted that he fired his weapon when Hunter grabbed him because he feared for his life.

¶ 43    Moore, however, testified that he did not know defendant and that defendant immediately drew his firearm when he encountered Moore and Hunter. Moore did not state that he was part of a group. Defendant asked if Moore and Hunter were from "5th Wuga world," and then pointed the firearm at Hunter's chest. Hunter pushed away the firearm and fled. After Hunter slipped and fell, defendant stood over him and shot him five times.

¶ 44    In their affidavits, Muhammad and Harris purported to be uninvolved eyewitness whose descriptions of the incident support defendant's testimony. The affidavits are not cumulative evidence where defendant and the State's witness presented conflicting versions of the incident at trial, and no other evidence at trial corroborated defendant's testimony. See *People v. Sparks*, 393 Ill. App. 3d 878, 886 (2009); see also *Woods*, 2020 IL App (1st) 163031, ¶¶ 52-53.

¶ 45    Finally, the affidavits must be of such conclusive character that they would probably change the result on retrial. *Robinson*, 2020 IL 123849, ¶ 47. New evidence may be conclusive even if it does not completely exonerate defendant. *Id.* ¶ 48. In fact, "a standard that requires evidence of total vindication or exoneration to support a claim of actual innocence," the standard used by the court below, is incorrect. *Id.* ¶ 55. Instead, this element "requires only that the [defendant] present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 56.

¶ 46    In assessing whether a postconviction petition has made a colorable claim of actual innocence, "the court considers only whether the new evidence, if believed and not positively rebutted by the record," could alter the result on retrial. *Id.* ¶ 60. New evidence is

positively rebutted by the record only if it is clear that no factfinder could "accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Id.* ¶ 60. If the evidence merely conflicts with evidence presented at trial, that is an insufficient reason to reject it. *Id.* ¶¶ 57, 73.

¶ 47 We find that the affidavits of Muhammad and Harris are not positively rebutted by the record. Muhammad and Harris stated that four to six people "jumped" defendant before shots were fired. Although defendant did not testify that he was "jumped," he did state that a group approached and surrounded him during the confrontation with Moore and Hunter. Moreover, Muhammad's and Harris's statements align with the trial testimony of Turner, who observed four to six people near where the shooting occurred. Construing the petition and the affidavits liberally, as we must, we cannot say that no factfinder could accept the affidavits as true.

¶ 48 Defendant has consistently maintained that he shot Hunter in self-defense. The testimony at trial, however, conflicted on whether Moore threatened defendant, defendant or Hunter was the aggressor, and if a group of people with Moore and Hunter surrounded defendant before he fired his weapon. The affidavits of Muhammad and Harris support defendant's testimony on how the incident unfolded, and no other evidence at trial corroborated this testimony. Such evidence, if believed, "places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 48; see also *People v. Willingham*, 2020 IL App (1st) 162250, ¶ 35 (finding that an affidavit corroborating defendant's self-defense claim would probably lead to a different result where there was conflicting testimony on the issue at trial). Therefore, we

find that the new evidence is of such conclusive character that it would likely alter the result on retrial.

¶ 49    Since defendant's petition has met the low threshold required to allege a claim of actual innocence at the first stage, we need not address his remaining claims because the Act does not permit piecemeal dismissal of individual claims at this stage. *People v. Rivera*, 198 Ill. 2d 364, 370-71 (2001). Instead, under the Act, the court must "docket the entire petition, appoint counsel, if the petitioner is so entitled, and continue the matter for further proceedings in accordance with sections 122-4 through 122-6." (Emphasis omitted.) *Id.* at 371.

¶ 50    We find that defendant has set forth an arguable claim of actual innocence based on the newly discovered affidavits of Muhammad and Harris. Accordingly, we reverse the circuit court's dismissal of defendant's petition as frivolous and patently without merit, and remand the cause for second-stage postconviction proceedings.

¶ 51    Reversed and remanded.