2025 IL App (1st) 231139-U

No. 1-23-1139

Order filed January 21, 2025

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 08443 |
| | ) | |
| MICHAEL STEELE, | ) | Honorable |
| | ) | Geraldine A. D'Souza, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court.
Justices Howse and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*: We reverse the circuit court's order denying defendant leave to file a successive postconviction petition where he presented a colorable claim of actual innocence based on newly discovered evidence.

¶ 2    Defendant Michael Steele appeals from an order of the circuit court denying him leave to file a successive petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)). He contends that he presented a colorable claim of actual innocence based on the

affidavits of three newly discovered witnesses supporting his claim of self-defense. We reverse and remand for second-stage proceedings.

¶ 3    Following a 2013 jury trial, defendant was found guilty of first degree murder over his claim of self-defense and was sentenced to 55 years in prison. As we discussed the trial evidence fully in our prior orders on appeal, we recite the facts here only to the extent relevant. See *People v. Steele*, 2016 IL App (1st) 140116-U; *People v. Steele*, 2020 IL App (1st) 172462-U.

¶ 4    Defendant's prosecution arose out of the shooting death of Tilford Jones on April 15, 2010.

¶ 5    At trial, Jasmine Parker testified that shortly before midnight on April 15, 2010, she drove to the "old projects" in Robbins to pick up a friend. There, she saw a group of people, including Jones, defendant, and Capri Pickett on the sidewalk. Jones and defendant were arguing. Jones then entered Pickett's vehicle. Defendant remained on the sidewalk and said he would "beat" Jones's "ass" and "boy, I'll kill you." Parker looked away and when she looked back, defendant and Jones were fighting. She did not see a firearm or other weapon in Jones's hand. Defendant ended up on his back with Jones leaning over him. Defendant then drew a firearm and shot Jones, who fell to the ground. Parker ducked and heard four or five gunshots. When she looked up, she saw defendant walk by holding a firearm. She did not see any firearm or other weapon on the ground near Jones. During cross-examination, Parker denied telling a detective that defendant and Jones argued over a girl, that Jones exited Pickett's vehicle and approached defendant, and that Jones repeatedly punched defendant in the face while defendant was on the ground.

¶ 6    Pickett, Jones's girlfriend, testified that she and Jones were talking to family and friends when she heard Jones say, "it's okay bro," and defendant say, "f*** that shit." Pickett did not know why defendant was upset. When she asked Jones what was going on, he told her to buy him

some cigarettes so that they could leave. Pickett began to walk away and turned around when she heard defendant raise his voice. She saw defendant hit Jones in the face and the men begin to fight. Defendant was on the ground with Jones squatting over him when defendant stopped swinging, reached into his "belt area," drew a firearm, and shot Jones. She did not see any weapon in Jones's hand. Pickett ran away and "blanked out" for a few seconds. When she looked back, Jones was on the ground with defendant standing over him. Defendant then fired four more shots at Jones.

¶ 7     Nurse Jane Johnson testified that defendant was treated at a hospital on April 16, 2010, for a gunshot wound to his left arm and that defendant said he was shot by a would-be robber.

¶ 8     Defendant testified that he knew Jones and had dated Pickett. On April 15, 2010, he approached Pickett to ask her out. She "didn't agree or disagree," but Jones had an "attitude" and told him to get the "f*** out of her face." Defendant replied that he could talk to Pickett if he wanted, and the men began to argue. Jones entered Pickett's vehicle, turned the radio up, and said if defendant talked to Pickett again, he would "slap the shit out of" him. Defendant responded, "[w]hatever, it's my bitch" and started talking to other people. Jones then approached him and struck him in the face with something that "looked like a gun." Jones threw defendant to the ground. Although defendant yelled at Jones to stop and for someone to break up the fight, Jones repeatedly hit him in the face. While on the ground with Jones on top of him, defendant "pulled [a firearm] out." Jones reached for the firearm, but defendant squeezed the trigger and shot himself in the forearm. At this point, Jones began "backing up off" defendant. Defendant was scared as he got up and shot the firearm in Jones's direction as defendant ran away.

¶ 9     Defendant gave inconsistent testimony about whether Jones had a firearm throughout the fight. On cross-examination, defendant said that he knew Jones had a firearm and that defendant

saw the firearm Jones "clobbered" defendant with. Defendant also said he was "punch drunk" from being hit in the head. He was "not sure" whether he saw a firearm in Jones's hand as defendant stood up and "didn't look in his hand to see if there was one." Then on re-direct, defendant said Jones was "whacking [him] up side [his] head with a gun" while on the ground, but also that he was "not sure" whether Jones had a firearm in his hand at the time. Finally, the State asked on re-cross-examination:

"Q. Did you see a handgun in Tilford Jones'[s] hand the night you were fighting with him on the ground?

A. No, while I was on the ground I was blocking the punches, blows. I had my hands up covering my face.

Q. Yes or no, did you see a gun?

A. No.

Q. No, right?

A. No.

Q. So the answer you just previously gave on re-direct by your counsel that you saw a gun in his hand, and as he was clobbering you in the head with a gun over and over is not the truth because he confused you?

A. He confused me. I saw the gun when he slammed me upside the head with it."

¶ 10    After defendant ran away, he called his mother and she took him to the hospital. Defendant admitted that he lied about how he was shot at the hospital because he was afraid of Jones's family. Defendant was taken from the hospital to a police station. During cross-examination, defendant admitted that he gave the police several different, false, accounts of the evening's events because

he was scared and confused. He also admitted that he shot himself with his own firearm, rather than the one that Jones struck him with.

¶ 11    Cook County sheriff's detective Steven Moody testified that when he asked Parker what defendant and Jones argued about, she said that "she wasn't sure, [but] maybe about a girl." Parker also said that Jones exited the vehicle and punched defendant in the face, the men fought, and defendant fell to the ground with Jones on top.

¶ 12    Marshall Bryant testified that he was robbed at gunpoint in December 2005 by two men and identified a photograph of Jones as depicting one of the robbers. The parties stipulated that Jones pled guilty to robbery in 2006 and was sentenced to three years in prison.

¶ 13    The jury found defendant guilty of first degree murder, and the trial court sentenced him to 55 years in prison, comprising 30 years for the murder plus a 25-year firearm enhancement.

¶ 14    On his first direct appeal, defendant contended that (1) his conviction should be reduced to second degree murder, (2) the circuit court failed to inquire into his *pro se* posttrial claims of ineffective assistance of trial counsel, and (3) his sentence was excessive. We affirmed defendant's conviction and sentence while remanding for a preliminary inquiry into his *pro se* posttrial ineffectiveness claims pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). See *Steele*, 2016 IL App (1st) 140116-U.

¶ 15    Following remand, defendant filed a motion for substitution of judge alleging bias and prejudice. The circuit court denied the motion, held a preliminary *Krankel* hearing, and denied defendant relief on his ineffectiveness claims. Defendant appealed, arguing the circuit court erred by denying his motion for substitution of judge without a hearing or forwarding to another judge. We affirmed. See *Steele*, 2020 IL App (1st) 172462-U.

¶ 16    In August 2021, defendant filed a *pro se* postconviction petition, alleging ineffective assistance of trial counsel and appellate counsel. In October 2021, the circuit court dismissed the petition as frivolous and patently without merit, finding *res judicata* barred defendant's trial counsel claim, and he had not shown his appellate counsel's performance prejudiced him. The record does not show an appeal from this order.

¶ 17    In December 2022, defendant filed a motion for leave to file a successive postconviction petition. He alleged (1) actual innocence based on newly discovered evidence, (2) ineffective assistance of counsel, and (3) prosecutorial misconduct. Defendant attached his own affidavit as well as affidavits from Darien Harris, Brandon Johnson, and Jeremy Lewis, each of whom claimed he had witnessed the April 15, 2010, shooting.

¶ 18    Harris averred that he was present at the "old housing projects" in Robbins on April 15, 2010, and that he knew both defendant—whom he referred to as "Ice Mike" and "Mike"—and Jones. Harris heard the two arguing over a girl and saw Jones exit a vehicle with a firearm and approach defendant, "pistol whipping" him with it. Jones punched defendant and knocked him to the ground, then got on top of him and continued punching him. Harris heard a gunshot and ducked, then looked up and saw defendant with a firearm and another firearm "a few feet from [Jones]." Jones "glanced at his gun on the ground and lunged for it. As [Jones] grabbed the gun, [defendant] shot him, I think 4 or 5 times." After the shooting, Harris ran home as he was "new to the area and wasn't even suppose[d] to be out that late." Then, "a couple days later," Harris heard that a family member of Jones had retrieved Jones's firearm before the police arrived.

¶ 19    Johnson also described being present at the incident and referred to defendant as "Ice Mike." He saw defendant and Jones argue, then Jones take a firearm from a vehicle and hit

defendant with it in the face. Jones knocked defendant down and continued punching him while the firearm lay on the ground next to him. Defendant then drew a firearm and shot himself in the arm, which caused Jones to jump back. Johnson averred, "[T]hey both slowly started to get up, then [Jones] looked down and saw his gun and grabbed it, and that[']s when Ice Mike shot him. I heard several shots." Afterward, defendant fled and someone named Chris Pickett retrieved Jones's firearm. Johnson ran to his cousin's apartment, where his aunt told him not to tell anyone what he saw for fear of retaliation. Because he was underage, he did what he was told. He further averred that at a memorial for Jones, "[P]eople confronted me and told me that I better not tell anybody what really occurred. Now that I am older, I feel as though the truth should be heard. It was self defense what Ice Mike did. He would have been shot by [Jones] if he didn't shoot [Jones]."

¶ 20    Lewis attested that he and a friend went to the housing projects to buy marijuana. There, Lewis saw Jones hit defendant in the face with a firearm, then Jones "dropped the pistol and began swinging his fist, punching Ice Mike repeatedly." Defendant fell and Jones continued punching him on the ground. Lewis heard a gunshot and saw defendant holding his bleeding arm. Lewis averred, "At first I thought [Jones] shot him, but I could see the gun [Jones] had which was about a foot or two besides [*sic*] [Jones], and Ice Mike was holding a gun." Both men started to get up and Jones reached for his firearm, then defendant shot him. Lewis heard four or five shots, Jones fell, and defendant fled. Chris Pickett took Jones's firearm and put it under his shirt, yelling, "We have to make it look like only Mike had a gun!" Chris Pickett then gave the firearm to Lewis's friend, saying, "Consider this a gift and go back to Harvey." Lewis and his friend drove away. In the vehicle, Lewis saw the firearm had blood on it and six bullets inside. Lewis's friend then put the firearm in the center console. Lewis averred, "I don't know what happened after that to the gun

*** We never talked about it again." Then in 2022, Lewis "ran into" defendant at a Department of Corrections facility and told defendant what Lewis witnessed. Lewis explained, "At first I didn't want to get involved, but I think the truth should come out. [Jones] did have a gun and it was self defense."

¶ 21    In his own affidavit, defendant again described the shooting. He wrote that after a verbal argument, Jones "snuck up from behind me and hit me in the face with something metal and hard," then punched defendant repeatedly, knocked him to the ground, and continued punching him. Defendant yelled for help but "the crowd was on [Jones's] side, cheering him on." While Jones was on top of defendant, defendant pulled his firearm from his pocket but accidentally shot himself in the forearm. Jones jumped off defendant, and they both got up slowly. Defendant wrote, "[Jones] then looked back at me then back at his gun on the ground. He then lunged for his gun. As he grabbed it, I shot him several times. He would [have] shot me if I didn't shoot him first." Defendant said that there were 15 to 20 people present, but he could only name Jones, Chris Pickett, Capri Pickett, and Danielle.[1] He did not know that Harris, Johnson, or Lewis was present.

¶ 22    The circuit court denied defendant's motion for leave to file his successive postconviction petition. In its written order, the court found that defendant's evidence in support of his actual innocence claim was not newly discovered because he could have discovered the three witnesses sooner through due diligence, noting the affiants all knew defendant by his nickname. The court also found the new evidence was not conclusive because defendant had testified he was unsure if Jones had a firearm and shot Jones as he was running away, which "completely contradicts what

---

[1] We presume defendant is referring to Capri Pickett's niece Danielle, whom Capri testified was also present at the shooting. Neither defendant nor Capri provide Danielle's last name.

[defendant] now states in his affidavit and pleadings." Regarding his claims of ineffective assistance of counsel and prosecutorial misconduct, the court found defendant had not shown cause and prejudice for failing to raise these claims earlier.

¶ 23    Defendant appeals, arguing that his motion set forth a colorable claim of actual innocence because the three affidavits of previously unavailable witnesses showed defendant shot Jones in self-defense and explained, for the first time, why police did not find Jones's firearm at the scene.

¶ 24    We review the denial of a request for leave to file a successive postconviction petition *de novo*. *People v. Robinson*, 2020 IL 123849, ¶ 40.

¶ 25    The Act provides a statutory remedy to criminal defendants who assert substantial violations of their constitutional rights occurred at trial. *Id.* ¶ 42. While the Act contemplates the filing of only one such postconviction petition, our supreme court has identified two bases upon which the bar against successive petitions may be relaxed: (1) when a defendant establishes "cause and prejudice" for failing to raise the claim earlier or (2) when a defendant asserts actual innocence under the "fundamental miscarriage of justice" exception. *Id.* In the instant appeal, defendant asserts actual innocence based on self-defense. See *People v. Woods*, 2020 IL App (1st) 163031, ¶ 41 (self-defense may serve as the basis for an actual innocence claim).

¶ 26    When a defendant requests leave to file a successive petition based on actual innocence, the circuit court should deny leave only where it is clear from a review of the petition and supporting documentation that the defendant cannot set forth a colorable claim as a matter of law. *People v. Edwards*, 2012 IL 111711, ¶ 24. Put another way, leave should be granted where the defendant's petition and documentation raise the probability that it is more likely than not no reasonable juror would convict him in light of the new evidence. *Id.* The evidence supporting the

defendant's claim of actual innocence must be (1) newly discovered, (2) material and not merely cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *Id.* ¶ 32. At the pleading stage, all well-pled allegations are taken as true unless positively rebutted by the trial record. *Robinson*, 2020 IL 123849, ¶¶ 45, 60. Credibility and reliability findings are left to the third-stage evidentiary hearing. *Id.* ¶ 61.

¶ 27    Accordingly, first we must determine whether the evidence is newly discovered—that is, if it was discovered after trial and defendant could not have discovered it earlier through the exercise of due diligence. See *People v. Ortiz*, 235 Ill. 2d 319, 334 (2009). The State suggests that defendant could have discovered these witnesses earlier because they were familiar enough with defendant to know his nickname, "Ice Mike," and Johnson and Lewis also knew Capri and Chris Pickett by name. We disagree.

¶ 28    In their affidavits, Harris, Johnson, and Lewis each asserted he witnessed the shooting and left immediately thereafter. Johnson and Lewis both explained they were not willing to come forward at the time. Specifically, Johnson averred that he left the scene immediately after the shooting and ran to his cousin's apartment, where his aunt told him not to tell anyone what he saw for fear of retaliation. Johnson—who was underage—did what he was told. He further stated that at a memorial for Jones, "[P]eople confronted me and told me that I better not tell anybody what really occurred." Lewis averred that, after the shooting, he and a friend drove away from the scene in possession of Jones's firearm. Lewis explained that he did not know what happened to the firearm because the two "never talked about it again."

¶ 29    Nothing in the affidavits or record indicates that defendant, his counsel, or the State was aware that Harris, Johnson, or Lewis witnessed the shooting. In his affidavit, defendant said that

although there were 15 to 20 people present, he could only name four, including Jones and Capri Pickett. As such, the testimony of these three witnesses constitutes newly discovered evidence. See *Ortiz*, 235 Ill. 2d at 334 (affidavit was newly discovered evidence where witness moved out of state after the incident and did not come forward until more than 10 years after trial); see also *People v. Anderson*, 2021 IL App (1st) 200040, ¶ 63 ("If an unknown, unobserved, and unrecorded witness chooses not to come forward, there is no amount of due diligence that can force him or her to come forward"); *People v. Frison*, 2022 IL App (1st) 211174-U, ¶¶ 37-38 (in initial postconviction petition, witnesses were newly discovered when they "made themselves unavailable by immediately running from the scene" and nothing in the record or affidavits indicated defendant knew of them earlier).[2]

¶ 30 Next, we address whether the evidence is material and noncumulative. Evidence is material if it is relevant and probative of the petitioner's innocence, and it is noncumulative if it adds to the information that the jury heard at trial. *People v. Coleman*, 2013 IL 113307, ¶ 96. Here, the key facts the affiants attest to are that Jones initiated the fight by hitting defendant in the head with a firearm and that Jones was reaching for his firearm when defendant shot him. Lewis further explained what happened to Jones's firearm.

¶ 31 The State argues that because defendant already testified that Jones started the fight by hitting him with a firearm, the three affiants' corroboration of these points is cumulative and does not add to what the jury heard at trial.

---

[2] "[A] nonprecedential order entered under subpart (b) of this rule on or after January 1, 2021, may be cited for persuasive purposes." Ill. S. Ct. R. 23(e) (eff. Feb. 1, 2023).

¶ 32 Here, defendant testified that Jones approached him and hit him in the head with something that "looked like a gun," then knocked him down and continued punching him. Defendant described himself as "punch drunk" after Jones "clobbered" him in the head and gave conflicting testimony about the fight, saying multiple times he was "not sure" whether Jones had a firearm in his hand while he punched defendant on the ground. The three new witnesses' affidavits contradict Parker and Capri Pickett's testimony that Jones did not have a firearm and clarify defendant's own confused recollection of the incident. As such, it adds to the information the jury heard at trial and is not merely cumulative. See *Woods*, 2020 IL App (1st) 163031, ¶ 51 (affidavit of new witness that corroborated defendant's trial testimony "raise[d] additional questions concerning the jury's verdict"); see also *People v. Sparks*, 393 Ill. App. 3d 878, 886 (2009) (in initial postconviction petition, affidavit of new witness was not cumulative where it corroborated defendant's assertion that victim was the aggressor); *Frison*, 2022 IL App (1st) 211174-U, ¶ 44 (in initial postconviction petition, new evidence was "not cumulative where defendant and the State's witnesses presented conflicting versions of the incident at trial, and no other evidence at trial corroborated defendant's testimony").[3]

¶ 33 We turn to the final and most important element of an actual innocence claim: the conclusiveness of the evidence. See *Robinson*, 2020 IL 123849, ¶ 47 (conclusive character of the evidence is the most important element). New evidence is conclusive if, considered along with the trial evidence, it would probably lead to a different result on retrial. *Id.* Our supreme court has explained that "the conclusive-character element requires only that the petitioner present evidence that places the trial evidence in a different light and undermines the court's confidence in the

---

[3] See *supra* ¶ 29 n.2.

judgment of guilt." *Id.* ¶ 56. Our task is not to "redecide the defendant's guilt," but rather to determine whether the facts should be "scrutinized more closely." *Coleman*, 2013 IL 113307, ¶ 97 (quoting *People v. Molstad*, 101 Ill. 2d 128, 136 (1984)).

¶ 34    Taking as true the accounts set forth in the affidavits that Jones instigated the fight, had a firearm, and was reaching for his firearm at the time defendant shot him, we find that this new evidence is of such conclusive character that it would probably change the result. We note that Parker, a State witness, was impeached with her own statement to police that Jones threw the first punch, and all the trial evidence indicated defendant fired his initial shot while on the ground with Jones on top of him. The new evidence contradicts the State's evidence casting defendant as the aggressor and Jones as unarmed. As such, it casts the trial evidence—including defendant's own inconsistent testimony about Jones's firearm—in a different light and "undermines [our] confidence in the judgment of guilt." See *Robinson*, 2020 IL 123849, ¶ 56.

¶ 35    The State argues that because the affidavits describe Jones's firearm as one or two feet away when defendant shot him, the new evidence can only show defendant acted *unreasonably* in self-defense for purposes of second degree murder. We agree second degree murder cannot serve as the basis for an actual innocence claim. See *People v. Horton*, 2021 IL App (1st) 180551, ¶ 46. However, we disagree that the affiants' version of events, taken as true, cannot support a claim of reasonable self-defense.

¶ 36    The use of deadly force in self-defense is justified when the person using such force reasonably believes it necessary to prevent imminent death or great bodily harm to himself. 720 ILCS 5/7-1(a) (West 2010). The law does not require an aggressor to be armed to justify use of a deadly weapon in self-defense. *People v. Evans*, 259 Ill. App. 3d 195, 209 (1994). Regardless of

defendant's inconsistent statements about Jones's firearm during the fight, he testified that Jones hit him with something that "looked like a gun," that Jones knocked him to the ground and was punching him in the head, and that he was afraid. These facts, if credited by the trier of fact, may satisfy the subjective belief element of self-defense—whether or not Jones in fact had a firearm in his hand. The jury evidently did *not* credit defendant's testimony at trial; if it had, it could have found him guilty of second degree murder. See *Horton*, 2021 IL App (1st) 180551, ¶ 46 ("Self-defense may apply if the defendant's belief as to the use of force was reasonable, while a conviction of second degree murder may be appropriate if the defendant's belief was unreasonable."). However, the new affidavits corroborate defendant's account of Jones as the armed aggressor and defendant acting in self-defense. See *Woods*, 2020 IL App (1st) 163031, ¶¶ 51-53 (new evidence corroborating defendant's claim of self-defense and contradicting State's witnesses may constitute a colorable claim of actual innocence). We find that three new eyewitnesses supporting defendant's version of events and clarifying the location of Jones's firearm throughout and following the fight would probably affect the jury's assessment of the trial evidence and change the result on retrial. Therefore, this evidence satisfies the conclusive-character element.

¶ 37    Accordingly, defendant's petition and supporting documentation satisfied the three elements of a colorable claim of actual innocence, and the circuit court should have granted him leave to file his successive petition under the Act.

¶ 38    For the reasons stated above, we reverse the circuit court's denial of defendant's motion requesting leave to file his successive postconviction petition based on actual innocence and remand for appointment of postconviction counsel and second-stage proceedings.

¶ 39    Reversed and remanded.